2013 WL 271666
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Dina BAKER, et al., Plaintiffs,
v.
HOME DEPOT USA, INC., Defendant.

No. 11 C 6768. | Jan. 24, 2013.

**Attorneys and Law Firms**

Lawrence Walner, Aaron Ross Walner, Walner Law Firm, LTD., Chicago, IL, Raymond A. Garcia, Garcia & Milas, P.C., New Haven, CT, for Plaintiff.

George Robert Dougherty, Daniel R. Fine, Grippo & Elden LLC, Chicago, IL, W. Marion Wilson, John P. MacNaughton, Robert P. Alpert, Morris, Manning & Martin, LLP, Atlanta, GA, for Defendant.

**Opinion**

*MEMORANDUM OPINION*

SAMUEL DER–YEGHIAYAN, District Judge.

**\*1** This matter is before the court on Defendant Home Depot U.S.A., Inc.'s (Home Depot) motion to dismiss, motion to strike class allegations, and motion for sanctions. For the reasons stated below, the motion to dismiss is granted in part and denied in part, the motion to strike class allegations is granted, and the motion for sanctions is denied.

**BACKGROUND**

Plaintiffs allege in their second amended complaint that Home Depot promoted the manufacture of, purchased, and sold wood that was treated with Chromium Copper Arsenate (CCA Treated Wood) for residential use. CCA Treated Wood allegedly contains arsenic and hexavalent chromium, which are known carcinogens. Home Depot allegedly marketed CCA Treated Wood to the public as safe for residential use, long-lasting, and low maintenance even though it knew or should have known of the health risks associated with CCA Treated Wood, including that CCA Treated Wood leaches arsenic, copper and hexavalent chromium into any surfaces with which it comes into contact.

Beginning in 2002, CCA Treated Wood was allegedly no longer marketed or sold in the United States for residential use due to its alleged inherent dangers. Home Depot allegedly issued a press release in February 2002 advising the public of this fact, but continued to represent to the public that CCA Treated Wood was safe for residential use. In addition, Home Depot allegedly continued to sell CCA Treated Wood for residential use until December of 2003. Plaintiffs allege that Home Depot was the largest single retailer of CCA Treated Wood for residential use.

In 2011, the Environmental Protection Agency, with other groups, allegedly published a guide relating to CCA Treated Wood, which explains the health risks associated with CCA Treated Wood and advises the public regarding the proper use, handling, cleaning, and maintenance of CCA Treated Wood to minimize health risks. According to Plaintiffs, although Home Depot knew of the dangers associated with CCA Treated Wood for decades, Home Depot did not communicate such information to the public when it sold CCA Treated Wood for residential use. Instead, Home Depot allegedly made representations to the public indicating that CCA Treated Wood was safe, including through posted signs and in-store representations made by trained sales associates.

Plaintiffs each allegedly own property on which a deck was built with CCA Treated Wood that was allegedly purchased from Home Depot. Plaintiffs' second amended complaint includes allegations made "on behalf of a multistate (but not nationwide) class" of persons owning real estate that includes a structure exposed to the weather that is made of CCA Treated Wood bought from Home Depot between January 1, 1991 and December 31, 2003, who have not suffered personal injury relating to CCA Treated Wood, but have allegedly suffered property damage. Plaintiffs include in their second amended complaint a strict liability-design defect claim (Count I), a strict liability-failure to warn claim (Count II), a negligencedefective product claim (Count III), a negligence-failure to warn claim (Count IV), and a claim alleging a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.* (Count V). Home Depot has moved to dismiss all claims. Home Depot has also moved to strike the class allegations and moved for sanctions.

EXHIBIT
Gr. 1

## LEGAL STANDARD

**\*2** In ruling on a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) (Rule 12(b)(6)), the court must draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Appert v. Morgan Stanley Dean Witter, Inc.,* 673 F.3d 609, 622 (7th Cir.2012); *Thompson v. Ill. Dep't of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir.2002). A plaintiff is required to include allegations in the complaint that "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level' " and "if they do not, the plaintiff pleads itself out of court." *E.E.O.C. v. Concentra Health Services, Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting in part *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Morgan Stanley Dean Witter, Inc.,* 673 F.3d at 622 (stating that "[t]o survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged") (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal quotations omitted).

## DISCUSSION

### I. Motion to Dismiss

### A. Counts I–IV

Home Depot argues that the product liability claims brought in Counts I–IV should be dismissed. In support of its argument, Home Depot contends that the second amended complaint does not plausibly suggest that Home Depot proximately caused Plaintiffs any harm, and that Plaintiffs have not satisfied the pleading standards of Federal Rule of Civil Procedure 8(a) (Rule 8(a)), as articulated in *Twombly.* Home Depot argues that the second amended complaint lacks sufficient detail relating to how Plaintiffs came to have decks made of CCA Treated Wood on their properties.

To state a valid claim under a theory of strict product liability under Illinois law, "a plaintiff must show that injury resulted from condition of product, that condition was unreasonably

dangerous, and that condition existed at time product left manufacturer's control." *Faucett v. Ingersoll–Rand Min. & Machinery Co.,* 960 F.2d 653, 655 (7th Cir.1992); *see also Malen v. MTD Products, Inc.,* 628 F.3d 296, 304 (7th Cir.2010) (stating that "[m]anufacturers and sellers are strictly liable for injuries caused by unreasonably dangerous products unless an unforeseen alteration by a third party introduced the unsafe condition") (citations omitted); *Smith v. Eli Lilly & Co.,* 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324, 328 (Ill.1990) (stating that "[t]he theory of strict liability is that one who sells a defective product unreasonably dangerous to the user is liable for the resulting injury") (citations omitted). To state a strict liability claim premised upon a failure to warn in Illinois "the plaintiff must allege and prove that defendant knew or should have known of the danger and this is tested on knowledge existing at the time of production." *Giles v. Wyeth, Inc.* 556 F.3d 596, 600 (7th Cir.2009) (quoting *Smith,* 148 Ill.Dec. 22, 560 N.E.2d at 344). To state a valid claim for negligence in Illinois, "a plaintiff must show a duty owed by the defendant to the plaintiff, a breach of that duty and an injury proximately caused by the breach." *Lindenmier v. City of Rockford,* 156 Ill.App.3d 76, 108 Ill.Dec. 624, 508 N.E.2d 1201, 1207 (Ill.App.Ct.1987); *see also Malen,* 628 F.3d at 303 (stating that "[t]o prevail on their claim of negligence, the plaintiffs would have to prove that the construction or design of the [product] breached a duty of care and was the proximate cause of [plaintiffs'] injury") (citations omitted).

**\*3** In the instant action, Plaintiffs allege that Home Depot encouraged the manufacture of, marketed, and sold CCA Treated Wood. Plaintiffs also allege that CCA Treated Wood is unreasonably dangerous because it was designed to leach dangerous carcinogens, that Home Depot knew or should have known of the dangers surrounding the use of CCA Treated Wood, that Home Depot had a duty to warn the public of such dangers or to sell a reasonably safe product, and that Home Depot failed to warn consumers of the dangers of CCA Treated Wood and instead represented to the public that CCA Treated Wood was safe for residential use. Plaintiffs have also alleged that they had decks built on their properties using CCA Treated Wood that was purchased from Home Depot. (A.Compl.Par.46, 51). Such facts are sufficient to state a claim under the federal notice pleading standards, and Home Depot has not cited any controlling precedent to the contrary. *See* Fed.R.Civ.P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"); *see also Swanson v. Citibank, N.A.* 614 F.3d 400, 403 (7th Cir.2010) (stating that "the Supreme Court

has adopted a 'plausibility' standard, but on the other hand, it has insisted that it is not requiring fact pleading"). Therefore, the motion to dismiss is denied with respect to Counts I–IV.

### B. Count V

Home Depot argues that the claim in Count V brought pursuant to the ICFA should be dismissed. In support of its argument, Home Depot contends that Plaintiffs have failed to allege facts to plausibly suggest that they were deceived by Home Depot, and that Plaintiffs have failed to satisfy the pleading standards of Federal Rule of Civil Procedure 9(b) (Rule 9(b)) with respect to the ICFA claim. Home Depot argues that Plaintiffs have not alleged that they were personally exposed to allegedly deceptive statements or omissions made by Home Depot regarding the safety of CCA Treated Wood. To state a valid claim under the ICFA, a plaintiff must show "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 235 Ill.2d 544, 337 Ill.Dec. 186, 922 N.E.2d 309, 313 (Ill.2009) (citation omitted). To satisfy the proximate cause element of an ICFA claim, a plaintiff must show that they "receive[d], directly or indirectly, communication or advertising from the defendant." *Id.* at 316. In addition, in pleading the fraud element of their claim, Plaintiffs must satisfy the heightened pleading requirements of Rule 9(b), which generally requires "the 'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 441–42 (7th Cir.2011).

In this case, Plaintiffs have alleged general facts solely relating to alleged misrepresentations and omissions made by Home Depot to the general public. For example, Plaintiffs allege that Home Depot posted placards in stores representing that CCA Treated Wood was safe for residential use, but Plaintiffs do not indicate any specific time period during which such signs were posted. (SA Compl. Par. 39). Plaintiffs also allege that employees of Home Depot verbally represented to the public that CCA Treated Wood was safe for residential use, but Plaintiffs have not alleged the time period during which such verbal representations were made. (SA Compl. Par. 40). In addition, Plaintiffs have not alleged facts to plausibly suggest that Home Depot's marketing regarding CCA Treated Wood ever reached Plaintiffs, either first-hand or via a third-party. Plaintiffs argue that the mere sale of a product can constitute a representation that the

product is safe, and thus the sale itself constitutes the only communication required to support a ICFA claim. However, the mere sale of CCA Treated Wood by Home Depot does not constitute a representation or omission that it is safe for residential use, since Home Depot could have been selling the product for other uses. Plaintiffs have not met the pleading standard of Rule 9(b), nor have Plaintiffs alleged sufficient facts to plausibly suggest that they personally relied upon Home Depot's allegedly deceptive marketing of CCA Treated Wood. Therefore, Plaintiffs have failed to state a claim under the ICFA. Based upon the above, the motion to dismiss is granted with respect to Count V.

### II. Motion to Strike

 *4 Home Depot has also moved to strike the class allegations in the second amended complaint. Home Depot argues that this court should apply the principle of comity to various decisions by other courts denying class certification in similar cases. Home Depot also argues that Plaintiffs' proposed multistate class fails under Seventh Circuit precedent, and that the proposed class cannot be ascertained. Pursuant to Federal Rule of Civil Procedure 23(c)(1) (A), "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed.R.Civ.P. 23(c) (1)(A) In addition, pursuant to Federal Rule of Civil Procedure 23(d)(1)(D), "[i]n conducting an action under [Rule 23], the court may issue orders that ... require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." Fed.R.Civ.P. 23(d)(1)(D). Where pleadings "are facially defective and definitively establish that a class action cannot be maintained," the court can properly grant a motion to strike class allegations at the pleading stage. *Wright v. Family Dollar, Inc.,* 2010 WL 4962838, at *1 (N.D.Ill.2010). The certification of a class in a case is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). A court may certify a class only if the "numerosity, commonality, typicality, and adequate representation" requirements of Federal Rule of Civil Procedure 23(a) (Rule 23(a)) are met and one of the requirements of Federal Rule of Civil Procedure 23(b) (Rule 23(b)) are met. Fed.R.Civ.P. 23(b) (requiring, in addition to the Rule 23(a) requirements, that (1) prosecuting separate actions ... create a risk of ...

establish[ing] incompatible standards of conduct for the [class opponent]; or ... adjudications ... [that are] dispositive of the interests of [class] members not parties to the individual adjudications or [that] substantially impair or impede [such class members'] ability to protect their interests; [or] (2) [that] final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or (3) that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy); *see also Dukes,* 131 S.Ct. at 2550; *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006) (stating that a "district court may certify a class of plaintiffs if the putative class satisfies all four requirements of Federal Rule of Civil Procedure 23(a)-numerosity, commonality, typicality, and adequacy of representation-and any one of the conditions of Rule 23(b)"); *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998) (stating that "[t]he Federal Rules of Civil Procedure provide the federal district courts with broad discretion to determine whether certification of a class-action lawsuit is appropriate").

**\*5** In support of its motion to strike, Home Depot has pointed to five other rulings made by various district courts across the country and the Illinois Appellate Court, in which class certification has been denied in materially similar cases. Plaintiffs argue that, under *Smentek v. Dart,* 683 F.3d 373 (7th Cir.2012), the cases cited by Home Depot are irrelevant. In *Smentek,* the Seventh Circuit indicated that the denial of class certification in a materially similar case does not have a preclusive effect. *Id.* at 377. However, the Seventh Circuit also indicated with respect to proposed class action litigation that, based upon the principle of comity, courts are required "to pay respectful attention to the decision of another judge in a materially identical case." *Id.*

Home Depot has shown that the cases it has cited in its motion to strike are materially identical to the instant action. In those cases, the courts found that the named plaintiffs could not satisfy the commonality, typicality, and adequacy requirements of Rule 23(a), that individual issues of fact and law would predominate, and that a class action would not be manageable, nor the superior method for resolving the claims brought. *See Martin v.*

*Home Depot U.S.A., Inc.,* 225 F.R.D. 198, 201, 202–03 (W.D.Tex.2004) (discussing problems presented by "material product variations," as well as various other individual issues); *Ardoin v. Stine Lumber Company,* 220 F.R.D. 459, 463, 467 (W.D.La.2004) (finding commonality and typicality requirements not met, in part, based upon individual defenses that might be available); *Jacobs v. Osmose,* 213 F.R.D. 607, 613 (S.D.Fla.2003); *Jacobs v. Home Depot U.S.A. Inc.,* 219 F.R.D. 549, 551 (S.D.Fla.2003); *see also Kitzes v. Home Depot U.S.A., Inc.,* 374 Ill.App.3d 1053, 313 Ill.Dec. 293, 872 N.E.2d 53, 59–62 (Ill.App.Ct.2007) (discussing individualized damages, individual defenses that might be raised, difficulty ascertaining source of product, and the difficulty establishing causation across class members). It is clear that many of the same problems identified by the courts in those cases with respect to class certification are similarly present in this case. Although Plaintiffs have pointed to many common issues of fact that would be present among the proposed class members, focusing the court's attention on Home Depot's alleged practices, issues of causation, the extent of each class members' injuries and the corresponding remedy, and the potential for individual affirmative defenses to apply to each class members' claims all preclude the certification of a class in this case. Therefore, the motion to strike is granted.

### III. Motion for Sanctions

Home Depot has also moved for sanctions pursuant to Federal Rule of Civil Procedure 11, arguing that Plaintiffs' class allegations have no reasonable basis in law or fact. There is no evidence that Plaintiffs acted in bad faith in including class allegations in their complaint. Although Plaintiffs were unsuccessful in their attempt to bring this action as a class action, based upon a review of the entire record, the court does not find that sanctions are warranted or appropriate in this case. Therefore, the motion for sanctions is denied.

### CONCLUSION

**\*6** Based on the foregoing analysis, the motion to dismiss is granted in part and denied in part, the motion to strike is granted, and the motion for sanctions is denied.

---

End of Document                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)
_____
118 Fair Empl.Prac.Cas. (BNA) 984

2013 WL 2351866
United States District Court,
W.D. Wisconsin.

Sandra LADIK, Penny Perkins, Jackie
Goebel, Marie Coggins and Sondra Steeb–
Lamb, on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
WAL–MART STORES, INC., Defendant.

No. 13–CV–123–bbc.   |   May 24, 2013.

**Synopsis**
**Background:** Female employees of retail store chain brought
Title VII against employer alleging sex discrimination.
Employer moved to dismiss class allegations.

**Holdings:** The District Court, Barbara B. Crabb, J., held that:

[1] as matter of first impression, pendency of action tolled
limitations period for potential class members not named in
complaint, and

[2] employees failed to satisfy commonality requirement, as
required to permit class certification.

Motion granted.

West Headnotes (4)

[1]   **Limitation of Actions**
        Class Actions, Matters Peculiar To
      Pendency of employees' Title VII action against
      employer tolled limitations period for potential
      class members not named in complaint. Civil
      Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
      2000e et seq.

[2]   **Federal Civil Procedure**
        Class Actions

Although it is usually the plaintiffs who move
to certify a class, any party may ask the
court to determine whether class certification
is appropriate. Fed.Rules Civ.Proc.Rule 23, 28
U.S.C.A.

[3]   **Federal Civil Procedure**
        In General;  Certification in General
      If defendant moves to dismiss class allegations
      before discovery, the court must evaluate the
      motion using a standard similar to that of
      a motion to dismiss for failure to state a
      claim. Fed.Rules Civ.Proc.Rules 12(b)(6), 23, 28
      U.S.C.A.

[4]   **Federal Civil Procedure**
        Sex Discrimination Actions
      Evidence of allegedly discriminatory
      employment decisions by local supervisors,
      based on gender, did not rise to level of
      significant proof that company operated under
      general policy of discrimination, as required to
      satisfy commonality requirement and to permit
      certification of plaintiff class in Title VII action;
      plaintiffs failed to identify a common mode of
      exercising discretion that pervaded the entire
      company, or a specific employment practice that
      created the disparity. Civil Rights Act of 1964,
      § 701 et seq., 42 U.S.C.A. § 2000e et seq.;
      Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**Attorneys and Law Firms**

Christine E. Webber, Joseph M. Sellers, Cohen Milstein
Sellers & Toll, Washington, DC, James Kaster, Katherine
Manuel Vander Pol, Matthew H. Morgan, Kate Ann Fisher,
Nichols Kaster, PLLP, Minneapolis, MN, Joecylyn D. Larkin,
The Impact Fund, Berkley, CA, Megan Ileah Brennan, for
Plaintiffs.

Theodore Joseph Boutrous, Jr., Catherine Anne Conway,
Gibson, Dunn & Crutcher LLP, Los Angeles, CA, Erik Kurt
Eisenmann, Thomas C. Ewing, Thomas P. Godar, Whyte
Hirschboeck Dudek S.C., Milwaukee, WI, Karl G. Nelson,

Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)

118 Fair Empl.Prac.Cas. (BNA) 984

Gibson, Dunn & Crutcher LLP, Dallas, TX, Mark Andrew Perry, Gibson Dunn & Crutcher LLP, Washington, DC, Thomas P. Godar, Whyte Hirschboeck Dudek S.C., Madison, WI, for Defendant.

**Opinion**

### OPINION AND ORDER

BARBARA B. CRABB, District Judge.

*\*1* This is a lawsuit brought under Title VII of the Civil Rights Act of 1964 by plaintiffs Sandra Ladik, Penny Perkins, Jackie Goebel, Marie Coggins and Sondra Steeb–Lamb, who are current or former employees of defendant Wal-mart Stores, Inc. Each plaintiff would have been a class member in *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), a case involving allegations of companywide sex discrimination, but the Supreme Court denied class certification on the ground that the plaintiffs had not shown any common questions of law or fact as required by Fed.R.Civ.P. 23(a)(2). In this case, plaintiffs are alleging again that defendant has engaged in widespread sex discrimination in both pay and advancement opportunities, but they seek to represent a smaller class involving only employees in "Region 14," which includes Wisconsin, Illinois, Indiana and Michigan. In particular, plaintiffs' proposed class includes women who have been employed by defendant in that region since December 26, 1998 and "who have been or may be subject to" a denial of a promotion or equal pay.

Three motions filed by defendant are before the court: its motion to dismiss the class allegations and two motions to take judicial notice of various documents it filed with its motion to dismiss. Dkt. # # 16, 18 and 32. In its motion to dismiss, defendant argues that plaintiffs cannot proceed as a class action for two reasons: (1) the statute of limitations has run since plaintiffs filed this case and the potential class members are not entitled to tolling; and (2) the complaint does not identify a common question of law or fact as required by Fed.R.Civ.P. 23. Alternatively, defendant argues that any class certified must be limited to those who have filed administrative charges with the Equal Employment Opportunity Commission and who have claims that may be brought in Wisconsin under Title VII's venue requirements.

Although I conclude that the statute of limitations does not bar the claims of the proposed class members, I am granting defendant's motion to dismiss because plaintiffs have

failed to identify any common questions of law or fact. In particular, they have not shown how the class they propose solves any of the problems the Court found in *Dukes.* This makes it unnecessary to consider defendant's arguments about exhaustion and venue. I am denying the motions to take judicial notice because it was not necessary to consider any of the documents in order to resolve the motion to dismiss.

In concluding that plaintiffs cannot proceed as a class action, I do not mean to question the seriousness of the allegations in the complaint. These allegations paint a disturbing picture about defendant's attitude and treatment of its female employees over the course of many years. If true, they demand immediate and comprehensive action by defendant to investigate and correct the problems. However, even the most serious problems cannot always be resolved by a class action lawsuit. In *Dukes,* the Supreme Court established a rigorous standard for courts to apply in assessing whether far-reaching cases such as this one comply with the federal rules. Because plaintiffs' complaint does not meet that standard, I must grant defendant's motion to dismiss.

*\*2* Plaintiffs fairly allege the following facts in their complaint.

### ALLEGATIONS OF FACT

#### A. *Defendant's Policies and Practices*

Defendant Wal–Mart Stores, Inc. owns retail stores throughout the country, including Wisconsin, Illinois, Indiana and Michigan. This case involves employees in defendant's "Region 14," which covers areas in those four states.

Within Region 14, support managers are the highest level hourly supervisory positions and they assume the duties of assistant managers when necessary. Defendant often selects employees for these positions arbitrarily through what is referred to as a "tap on the shoulder" promotional system. Employees in these positions are often groomed for further advancement.

Before 2004 defendant had no system for posting positions for the management training program. No formal application process or job-related criteria for making selections existed for these positions.

Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)

118 Fair Empl.Prac.Cas. (BNA) 984

In January 2003, defendant instituted a "one-time, online application process" for entry into the management training program. Potential applicants were required to accept the conditions that they would travel for up to six weeks at a time and be subject to a varied and irregular schedule. Failure to accept these conditions precluded consideration as an applicant.

In 2006 defendant adopted a "formalized" application process for certain positions called the "career preferences program." However, female employees who qualified for the program have complained that they were not selected to be interviewed. For example, Margie Bracken never heard about promotion opportunities until after male employees received the promotions. In addition, female employees have complained of unwarranted "coaching" and progressive discipline after showing interest in a promotion through the program. For example, when defendant posted a new management position, Tammy Nichols was frequently coached for minor issues, which disqualified her for the promotion.

Entry into the management training program is a requirement for advancement into salaried management positions. However, before 2006, hourly employees in Region 14 were not provided any information about how to become a manager, what the requirements or qualifications were or how to apply for the program. Even after defendant initiated the career preferences program in 2006, "the tap on the shoulder" system continued, with management instructing certain people to apply when openings arose without regard to objective criteria.

Defendant has "uniform guidelines" establishing minimal eligibility criteria for promotion into the management training program. These include minimum tenure, age, absence of current "active" discipline, satisfactory recent performance evaluation and willingness to relocate. However, managers retain the ability to make subjective judgments. (Defendant's founder, Sam Walton, conceded in 1992 that the relocation requirement creates unnecessary barriers to female advancement.)

**\*3** Regional vice presidents select co-managers, subject to approval by the divisional senior vice president. The minimal eligibility requirements for promotion to co-manager include satisfactory performance and willingness to relocate, but there are no job-related criteria for making selections among those

who meet the minimum requirements or in determining where to assign a new co-manager.

### B. *Gender Disparities*

Female employees in Region 14 have been much less likely than their male counterparts to receive promotion to management track positions, even when they possess equal or better qualifications than their male counterparts. Females employed in Region 14 must wait significantly longer to be promoted into management track positions than men with equal or lesser qualifications. Defendant's "management" is aware of gender disparities in promotions in Region 14 and has failed to take any remedial action.

### C. *Discriminatory Attitudes*

A 1998 survey of Wal–Mart managers revealed that there was a "good ol' boy philosophy" at the company, that many managers were "close minded" about diversity in the workplace and that district managers "don't seem personally comfortable with women in leadership roles." A committee of defendant's few female executives reported that "stereotypes limit the opportunities offered to women."

On January 24, 2004, at a meeting of all of defendant's district managers presided over by chief executive officer Thomas Coughlin, the district managers were told that the key to success is a "single focus to get the job done ... women tend to be better at information processing. Men are better at focus[ing on a] single objective."

At a training at defendant's Walton Institute, managers were advised that there are fewer female managers because men are "more aggressive in achieving those levels of responsibility" than women. Managers were cautioned that efforts to promote women could lead to the selection of less qualified women over more qualified men.

### D. *Incidents of Discrimination: Named Plaintiffs*

Plaintiffs Sandra Ladik, Penny Perkins, Jackie Goebel, Marie Coggins and Sondra Steeb–Lamb are residents of Wisconsin. Ladik worked for defendant from 1992 to 2006; Perkins worked for defendant from 1998 until 2010; Coggins worked for defendant at various intervals between 1988 and 2010;

Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)
118 Fair Empl.Prac.Cas. (BNA) 984

Steeb–Lamb worked for defendant from 2000 to 2008; Goebel has worked for defendant since 1988.

Plaintiff Ladik held various jobs at defendant's store in Portage, Wisconsin, including manager of the maintenance department. In 2001 or 2002 she became aware that a male employee she trained made a significantly higher wage than she did, even though she had more experience and responsibility than he did. Later, she learned that many other male department heads were making more money than she was and that many men she trained started at a wage she did not receive until she completed many years of service.

   **4**  Plaintiff Perkins worked as a department manager at defendant's Beloit, Wisconsin store. She received only one merit raise during the 12 years that she worked for defendant, even though a male associate who had less experience than she did received six merit raises during the same time period. Despite her consistently positive performance, Perkins received smaller annual percentage raises than male coworkers.

Plaintiff Goebel believes that it is common knowledge around the store in Kenosha, Wisconsin that men are paid more than women for the same work. When plaintiff was a "pay grade 6," she learned that a male coworker who was a "pay grade 2" made "only a penny less than" she did. Goebel has not received a raise in six years.

Plaintiff Coggins worked at various stores in southern Wisconsin and northern Illinois. Throughout this time, men were paid more for the same work that she did. When plaintiff transferred to the Janesville, Wisconsin store in 1997, she was hired as a cashier even though she was qualified to serve as a department manager. In 2009, plaintiff expressed interest in salaried management positions, but she was not even considered for an interview, despite her exemplary performance. Defendant gave the position to a man from another store with less experience.

Plaintiff Steeb–Lamb began working for defendant at the same time as her husband. Despite being "comparable in every way," she was paid less than he was. After plaintiff completed the management training program, she was assigned to the bakery department at the Wisconsin Dells store. This was the worst assignment in the area because the department was poorly run and had very little profit, which effectively prevented Steeb–Lamb from moving up in management.

Plaintiff Steeb–Lamb received many "coachings" from her store manager, many of which were for insignificant issues. (Plaintiffs do not explain what "coachings" are, but I assume that they are a form of reprimand.) During her year in management training, defendant terminated three female assistant managers. Frustrated with the unfair treatment she received, plaintiff returned to work as an hourly associate.

### E. *Incidents of Discrimination: Potential Class Members*

Miriam Briggs–Muhammed worked for defendant "on and off" from 1975 to 2008. Despite a long employment history with defendant and successful completion of the tests, the personnel manager rejected her for the management training program on the ground that she was "not management material."

When Carol Frendling asked "management" why male assistant managers were not required to work extended hours like female assistant managers, they told her that male assistant managers "ha[d] families to go home to." Kathleen Cole's manager explained that the reason for the disparity between her pay and her male counterpart's pay was defendant's "philosophy" that men were paid more because they were heads of the household and they had families to support.

   **5**  Male managers made derogatory comments to Delorah Mims, such as, "if you were a man, you would know."

### OPINION

#### A. *Statute of Limitations*

Defendant's first argument relates to the proper scope of two decisions by the Supreme Court regarding the extent to which a class action tolls the limitations period for subsequent lawsuits. In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Supreme Court held that "[t]he commencement of [an] original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." The Court reasoned that a contrary rule would undermine the efficiency purpose of Rule 23 because

Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)
_____
118 Fair Empl.Prac.Cas. (BNA) 984

it would require all potential class members to join the suit or file motions to intervene at the outset of the case or risk losing their claims in the event the court refused to certify the class. *Id.* at 553. In addition, tolling would not undermine the purpose of the statute of limitations because the class representatives will have given the defendant notice "not only of the substantive claims being brought against [it], but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *Id.* at 555.

In *Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 350, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), the Court extended the rule of *American Pipe* to toll the limitations period not just for intervenors but for class members who filed their own lawsuits as well. The Court repeated its concern that a contrary rule would encourage the filing of unnecessary protective lawsuits before the limitations period expired. *Id.* 350–51. In addition, the Court noted that there are a number of legitimate reasons why class members might want to file their own lawsuits, such as to obtain a more convenient forum or more control over the litigation. *Id.* at 350.

The parties agree that, under the tolling principles in *American Pipe* and *Crown, Cork & Seal,* the named plaintiffs filed the complaint in this case within the limitations period. They also agree that the limitations period for all the claims raised in this case has since expired. The question raised in defendant's motion is whether the filing of *this* lawsuit tolled the statute of limitations for potential class members not named in the complaint.

 **[1]**  The closest that the Court of Appeals for the Seventh Circuit has come to answering this question was in *Sawyer v. Atlas Heating and Sheet Metal Works, Inc.,* 642 F.3d 560 (7th Cir.2011). In that case, the plaintiff wanted to proceed as a class, but the defendant objected because the plaintiff's claims were the same as those in a previous proposed class action that was dismissed voluntarily before the court decided whether the case should be certified as a class action. The parties in *Sawyer* framed the issue the same way as the parties in this case, as a question of tolling, but the court rejected that approach: "the propriety of class certification in Sawyer's suit has nothing to do with tolling or *American Pipe,* and everything to do with the preclusive effect of the first decision, plus a proper application of Rule 23's criteria." *Id.* at 564. Framing the question as one of issue preclusion, the court found no reason to bar the case from proceeding as a class. "Because Park Bank [the plaintiff in the previous case] dismissed its suit before the state judge could decide whether

to certify a class, that disposition does not carry any force for any class member other than Park Bank." *Id.* at 564.

 **\*6**  Defendant is quick to point out that the facts in *Sawyer* are distinguishable because the plaintiffs in *Dukes* did receive a ruling on their class certification motion. This is true, but the argument misses the point, which is that the court of appeals rejected a view that the tolling rule in *American Pipe* should apply any differently to a class action than to an individual lawsuit. That view is consistent with a discussion in an earlier case:

> Both *Armstrong [v. Martin Marietta Corp.,* 138 F.3d 1374 (11th Cir.1998) ] and *Basch v. Ground Round, Inc.,* 139 F.3d 6 (1st Cir.1998), which holds that tolling from multiple unsuccessful class actions can't be "stacked," suggest that *Crown, Cork & Seal* sets the outer limit of the *American Pipe* doctrine. A concurring opinion by three Justices in *Crown, Cork & Seal* observed that the tolling doctrine "is a generous one, inviting abuse." 462 U.S. at 354 (Powell, J., concurring). But the "abuse" about which these Justices expressed concern was raising new or peripheral claims only tangentially connected with the original class suit. As all nine Justices recognized, a complaint seeking certification as a class action notifies the defendant of the claim and the potential scope of relief. For many purposes *it is best to speak of such a complaint as satisfying, rather than tolling, the statute of limitations.*

*Hemenway v. Peabody Coal Co.,* 159 F.3d 255, 266 (7th Cir.1998). In other words, once a plaintiff has filed a complaint that is timely under *American Pipe,* the tolling issue is resolved, regardless whether the plaintiff wishes to proceed individually or as a class. Although the previous class action that failed may have implications on a new motion for class certification, the statute of limitations is not one of them.

As noted in *Gomez v. St. Vincent Health, Inc.,* 622 F.Supp.2d 710, 718–19 (S.D.Ind.2008) (Hamilton, J.), the Supreme Court's reasons for adopting the tolling rule in *American Pipe* apply equally to both individual suits and class actions. For example, a refusal to extend tolling to subsequent class actions would encourage protective lawsuits and undermine the efficiency that Rule 23 is designed to promote. Judge Hamilton explained the consequences of adopting the rule that defendant is proposing in this case:

> The problem is that other potential plaintiffs who are waiting to see if a first class action will protect their

Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)

118 Fair Empl.Prac.Cas. (BNA) 984

rights may need to make a decision before the first court makes its decision [on class certification].... The cautious approach would therefore be to go ahead and file the additional class action(s) before a denial. A rule that creates that incentive seems to run contrary to the aim of *American Pipe* to avoid needless filings of repetitive claims. It also presents a risk of effectively binding absent class members by decisions in which they were not adequately represented.

*Id.* at 718–19. Further, applying *American Pipe* to subsequent class actions does not undermine the purpose of the statute of limitations because defendants will already have notice of the claims and the "generic identities" of the class members at the time the second lawsuit is filed. *Id.* at 722. Although Judge Hamilton acknowledged that there were legitimate concerns about relitigating class issues, he concluded that limiting *American Pipe* to individual suits was not the way to address those concerns. "The lesson of *American Pipe* and *Crown, Cork & Seal* is that tolling is appropriate for a second class action attempt, and the merits of that attempt can be addressed through application of principles of stare decisis and issue preclusion." *Id.* at 723.

**\*7** *Gomez* is persuasive and consistent with the decisions of both the Supreme Court and the Court of Appeals for the Seventh Circuit. Accordingly, I conclude that the statute of limitations does not bar plaintiffs from proceeding as a class. Because defendant does not argue that issue preclusion or any kind of estoppel bars plaintiffs from proceeding as a class, I do not consider those issues.

### B. *Rule 23*

**[2]** **[3]** Although it is usually the plaintiffs who move to certify the class under Fed.R.Civ.P. 23, any party may ask the court to determine whether class certification is appropriate. *Blihovde v. St. Croix County,* 219 F.R.D. 607, 612 (W.D.Wis.2003). *See also* Fed.R.Civ.P. 23(c)(1) (requiring courts to make certification decision "[a]t an early practicable time" without specifying the party who may request the decision). However, if the defendant moves to dismiss the class allegations before discovery, the court must evaluate the motion using a standard similar to that of Fed.R.Civ.P. 12(b)

(6). *Sjoblom v. Charter Communications, LLC,* 2007 WL 4560541, \*6 (W.D.Wis.2007); *Schilling v. Kenton County, Kentucky,* 2011 WL 293759, \*4 (E.D.Ky.2011); *Bryant v. Food Lion, Inc.,* 774 F.Supp. 1484, 1495 (D.S.C.1991). *See also General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("Sometimes ... issues [regarding class certification] are plain enough from the pleadings."). Under that standard, the plaintiffs' allegations must "state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In the context of a determination under Rule 23, the question is whether plaintiffs' allegations are sufficient to show that it is plausible that plaintiffs will be able to satisfy the Rule 23 requirements after conducting discovery.

Rule 23 includes several requirements for class certification, but defendant's motion is limited to one: whether "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). This is the same requirement at issue in *Dukes,* —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374, which the Court found to be lacking. Defendant argues that plaintiffs have not cured and cannot cure the deficiencies that the Court identified previously.

In *Dukes* the Court summarized the plaintiffs' theory of discrimination as follows:

These plaintiffs, respondents here, do not allege that Wal–Mart has any express corporate policy against the advancement of women. Rather, they claim that their local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees. And, respondents say, because Wal–Mart is aware of this effect, its refusal to cabin its managers' authority amounts to disparate treatment.

*Id.* at 2548 (citations omitted).

The Court began its analysis under Rule 23(a)(2) by emphasizing that a common question is not established simply because each of the plaintiffs suffered a violation of the same law. *Id.* at 2551. Rather, the "claims must depend upon a common contention ... that is capable of classwide

Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)

118 Fair Empl.Prac.Cas. (BNA) 984

resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In the context of that case, the Court stated that the plaintiffs needed to "produce a common answer to the crucial question *why was I disfavored.*" *Id.* at 2552 (emphasis in original).

*8 The Court identified two ways the plaintiffs could make that showing: (1) a biased testing procedure; or (2) a general policy of discrimination in which "the discrimination manifested itself ... in the same general fashion." *Id.* at 2553. The Court stated that the plaintiffs' theory of discrimination was inconsistent with a finding of a biased testing procedure because "[t]he whole point of permitting discretionary decisionmaking is to avoid evaluating employees under a common standard." *Id.* In support of a general policy of discrimination, the plaintiffs cited a report of their expert, but the Court did not find it helpful because the expert "could not ... determine with any specificity how regularly stereotypes play a meaningful role in employment decisions." *Id.*

The Court acknowledged that "giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.' " *Id.* at 2554 (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 990, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). However, the problem was that the plaintiffs had "not identified a common mode of exercising discretion that pervades the entire company." *Id.* at 2554–55. The plaintiffs relied on statistical data showing that defendant promoted women less often than men, but the Court rejected the data because it could not show how discretion was exercised at particular stores. *Id.* at 2555. In any event, even if there was a gender disparity, the Court held that the plaintiffs' class claims failed because the plaintiffs had not identified a "specific employment practice" that created the disparity. *Id.* An allegation of delegated discretion was not sufficient. *Id.*

Finally, the Court found that "120 affidavits reporting the experiences of discrimination—about 1 for every 12,500 class members" were not sufficient to show a general policy of discrimination. *Id.*

[4] Plaintiffs argue that *Dukes* is not controlling because of several differences in the proposed classes. First, plaintiffs say that they have "refined" the class so that it includes only one region rather than the entire country, Plts.' Br., dkt. # 29, at 20, but plaintiffs fail to explain how this change addresses any of the problems with the previous class. Although the Court noted the class's large size, the Court did not suggest that certification should be denied because the class was too numerous. By limiting the class geographically, plaintiffs simply have created a smaller version of the same problem. Regardless whether the class is nationwide or encompasses only one part of the country, plaintiffs still face the same challenge, which is to identify "a common contention ... that is capable of classwide resolution." *Dukes,* 131 S.Ct. at 2551. In other words, plaintiffs must show a policy or practice *at the regional level* that applies to the entire class. In this regard, plaintiffs point to nothing in their complaint that is different from the allegations in *Dukes.*

*9 Second, plaintiffs say that their proposed class focuses on a "core group of decision makers," Plts.' Br., dkt. # 29, at 20, but this is just a different way of saying that plaintiffs have limited the size of the class to one region because the "core group" is simply the unidentified "Region 14 managers." Plaintiffs cite a statement from *Dukes,* 131 S.Ct. at 2251, that an example of a common contention could be "the assertion of discriminatory bias on the part of the same supervisor," but plaintiffs have not identified one supervisor that is responsible for all the decisions at issue in this case and they do not explain how the collective decisions of the "Region 14 managers" are linked except by the same "corporate culture" of gender bias that the Court found unpersuasive in *Dukes.*

Third, plaintiffs provide several anecdotes of discriminatory conduct that occurred within Region 14. Again, however, the problem is that plaintiffs do not show how these incidents can be tied together as part of a policy of discrimination. Plaintiffs include several allegations about discriminatory attitudes by Wal–Mart executives, but these seem to be the same allegations that plaintiffs made in *Dukes.* Plaintiffs do not explain why the allegations should be more persuasive in the context of this case.

Fourth, plaintiffs list what they identify as the common questions in this case:

- whether Defendant, through its Region 14 managers with final authority to make the challenged decisions, has engaged in a pattern or practice of discrimination in pay and management track promotions against its female employees in Region 14;

Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)

118 Fair Empl.Prac.Cas. (BNA) 984

- whether Defendant, through its nationwide policies, including but not limited to, the Relocation Policy, Career Preferences Program, Pay Cap Policy, and Scheduling and Attendance Policies, as implemented and utilized by Region 14 management, has engaged in a pattern or practice of discrimination in pay and management track promotions against its female employees in Region 14;

- whether Defendant's nationwide policies, including but not limited to the Relocation Policy, Career Preference Policy, Pay Cap Policy, and Scheduling and Attendance Policies, as implemented and utilized by Region 14 management have had an adverse impact on the proposed class and if so whether this impact can be justified by business necessity;

- whether there are statistical patterns adverse to female employees in pay and management track promotions in Region 14;

- whether Defendant was aware of the impact of their nationwide policies and practices on its women employees;

- whether relief and punitive damages relief for the proposed classes are warranted.

Again, these are substantially the same questions identified in *Dukes*. For example, in her dissent, Justice Ginsburg argued that the Court gave "no credence to the key dispute common to the class: whether Wal-Mart's discretionary pay and promotion policies are discriminatory." *Dukes,* 131 S.Ct. at 2565 (Ginsburg, J., dissenting). In particular, Justice Ginsburg noted the allegations that "the company relies on gender stereotypes in making employment decisions such as promotions and pay," that "Wal–Mart permits those prejudices to infect personnel decisions ... by leaving pay and promotions in the hands of a nearly all male managerial workforce using arbitrary and subjective criteria," and that "alleged barriers to the advancement of female employees include the company's requirement, as a condition of promotion to management jobs, that employees be willing to relocate." *Id.* (alterations and internal quotations omitted). In addition, she noted the lower court's findings that "[t]he selection of employees for promotion to in-store management is fairly characterized as a 'tap on the shoulder process,' in which managers have discretion about whose shoulders to tap" and that "[v]acancies are not regularly posted; from among those employees satisfying minimum qualifications,

managers choose whom to promote on the basis of their own subjective impressions." *Id.*

**\*10** Plaintiffs do not even attempt to distinguish the common questions they identify from those found lacking in *Dukes.* In fact, most of their alleged common questions still relate to "nationwide polices," not any policies of Region 14.

Plaintiffs cite *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 672 F.3d 482, 489 (7th Cir.2012), as support for their argument that their class allegations are sufficient for a disparate impact claim. In *McReynolds,* the plaintiffs were brokers challenging two companywide policies at a firm, a "teaming" policy and an "account distribution" policy. Under the teaming policy, brokers were permitted to form teams of their own choosing; under the account distribution policy, a departing broker's accounts were distributed according to the past success of the other brokers in a particular office. The court concluded that the plaintiffs could challenge both policies under a disparate impact theory:

> If the teaming policy causes racial discrimination and is not justified by business necessity, then it violates Title VII as 'disparate impact' employment discrimination— and whether it causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination.

> And likewise with regard to account distributions: if as a result of racial preference at the team level black brokers employed by Merrill Lynch find it hard to join teams, or at least good teams, and as a result don't generate as much revenue or attract and retain as many clients as white brokers do, then they will not do well in the competition for account distributions either; and a kind of vicious cycle will set in.... This spiral effect attributable to company-wide policy and arguably disadvantageous to black brokers presents another question common to the class, along with the question whether, if the team-inflected account distribution system does have this disparate impact, it nevertheless is justified by business necessity.

*Id.* at 489–90. The court distinguished *Dukes* on the ground that "permitting brokers to form their own teams and prescribing criteria for account distributions that favor the already successful ... are practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim," which was the situation in *Dukes.*

Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)

118 Fair Empl.Prac.Cas. (BNA) 984

In response, defendant cites *Bolden v. Walsh Construction Co.,* 688 F.3d 893, 895 (7th Cir.2012), in which the plaintiffs were construction workers alleging discrimination in the assignment of overtime work and in working conditions at more than 250 sites. The court concluded that *Dukes* foreclosed a class action. "In *Wal–Mart,* as here, the plaintiffs contended that discretionary acts by local managers (of stores in *Wal–Mart,* of construction sites here) produced discriminatory effects.... [W]hen multiple managers exercise independent discretion, conditions at different stores (or sites) do not present a common question." *Id.* at 896. The court distinguished *McReynolds* on the ground that *McReynolds* was a challenge to company policies, but the only policy at issue in *Bolden* was "its grant of discretion to superintendents in assigning work and coping with offensive language or bigoted conduct." *Id.* at 897 (The court also noted several "policies" and "practices" identified by the plaintiffs, such as a "Policy/Practice of allowing foremen and supervisors to make promotion decisions without reference to any objective criteria," but the court concluded that these were simply different ways of delegating discretion. *Id.* at 898.)

*11 *Dukes, McReynolds* and *Bolden* each involved decisions by a company to grant discretion to employees. In *McReynolds,* the court found that the delegation qualified as a company policy that could be challenged in a class action; in *Dukes* and *Bolden* the courts came to the opposite conclusion. Although there may be tension among these cases, plaintiffs cannot benefit from any inconsistency because plaintiffs' allegations are much more similar to *Dukes* and *Bolden* than they are to *McReynolds.* One important difference between this case and *McReynolds* is that the plaintiffs in *McReynolds* focused on two discrete policies that applied equally to each class member. The plaintiffs in this case (and *Dukes*) point to a hodgepodge of different alleged policies and practices that they say contribute to discrimination, but it would be impossible for all of the contributing factors to "produce a common answer to the crucial question *why was I disfavored.*" *Dukes,* 131 S.Ct. at 2552 (emphasis in original). Even the named plaintiffs in this case do not allege that many of the policies affected them personally.

By challenging so many different matters in the same case, plaintiffs have made it impossible to craft a cohesive class. In other words, unlike the plaintiffs in *McReynolds,* the plaintiffs in this case have "not identified a common mode of exercising discretion that pervades the entire company," *id.* at 2554–55, or a "specific employment practice" that created the disparity. *Id.* at 2555.

In *Bolden,* the court of appeals hinted at the appropriate scope of a class in a case like this. In summarizing *Dukes,* the court of appeals stated that "the Court held that a class including all stores could not be certified. *One class per store may be possible;* one class per company is not." *Bolden,* 688 F.3d at 897 (emphasis added). Rather than seek to limit the scope of the national class to a discrete policy (such as the relocation requirement) or to a more cohesive group (such as the employees at one store), plaintiffs chose instead to narrow the class arbitrarily without addressing any problems identified by the Supreme Court.

Plaintiffs cite a number of district court cases in their brief for the proposition that courts should be wary of making a definitive determination about class certification at the pleading stage. I agree that it is the rare case in which it is clear from the pleadings that the plaintiffs may not proceed as a class, but this is one of those cases because plaintiffs have not alleged "more than a sheer possibility" that they can distinguish their proposed class from the class rejected in *Dukes. Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *See also Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943, 949 (6th Cir.2011) ("That the motion to strike came before the plaintiffs had filed a motion to certify the class does not by itself make the court's decision reversibly premature."); *Scott v. Family Dollar Stores, Inc.,* 2012 WL 113657, *4 (W.D.N.C.2012) (dismissing class allegations at pleading stage because "the plaintiffs in *Dukes* presented virtually identical claims as plaintiffs in this lawsuit"). Particularly because plaintiffs do not explain how discovery could make a difference to the issue of certification in this case, I see no reason to delay the inevitable.

## ORDER

*12 IT IS ORDERED that

1. Defendant Wal–Mart Stores, Inc.'s motion to dismiss the complaint as to the class allegations, dkt. # 16, is GRANTED.

2. Defendant's motions to take judicial notice, dkt. # # 18 and 32, are DENIED as unnecessary.

### Parallel Citations

118 Fair Empl.Prac.Cas. (BNA) 984

**Ladik v. Wal-Mart Stores, Inc., --- F.R.D. ---- (2013)**

118 Fair Empl.Prac.Cas. (BNA) 984

---

**End of Document**
© 2013 Thomson Reuters. No claim to original U.S. Government Works.

16 Wage & Hour Cas.2d (BNA) 1773

2010 WL 4962838
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Syreeta WRIGHT, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
v.
FAMILY DOLLAR, INC., a
foreign corporation, Defendant.

No. 10 C 4410. | Nov. 30, 2010.

**Attorneys and Law Firms**

Robert H. Rosenfeld, Robert H. Rosenfeld & Associates, LLC, Terrence Buehler, Touhy, Touhy, Buehler & Williams, LLP, Chicago, IL, for Plaintiff.

John Anthony Ybarra, Amy Schaefer Ramsey, Todd M. Church, Littler Mendelson, P.C., Chicago, IL, for Defendant.

**Opinion**

### MEMORANDUM OPINION AND ORDER

ROBERT W. GETTLEMAN, District Judge.

 **\*1** Plaintiff Syreeta Wright filed a two-count putative class action complaint in the Circuit Court of Cook County, alleging that her former employer, defendant Family Dollar, failed to pay actual and overtime compensation to her and other "associates" (non-exempt, store-level employees) in violation of the Illinois Wage Payment & Collection Act, 820 ILCS § 115, *et seq.* (Count I), and the Illinois Minimum Wage Law, 820 ILCS § 105, *et seq.* (Count II). Defendant removed the case to federal district court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1453. Defendant has filed the instant motion to strike class allegations pursuant to Fed.R.Civ.P. 23(c)(1)(A) and (d)(1)(D), contending that plaintiff cannot establish typicality and adequacy of representation, Fed.R.Civ.P. 23(a)(3)-(4). For the following reasons, defendant's motion is granted.

### BACKGROUND

Plaintiff alleges that defendant withheld compensation from associates by giving its store managers unfeasibly low payroll budgets which, despite defendant's official policy prohibiting managers from requiring associates to work without compensation, effectively forced all managers to do exactly that. Plaintiff's putative class consists of "all individuals who were employed by the Defendant as an Associate in any Illinois store at any time during the relevant statute of limitations period who: 1) were not paid for regular hours worked; or 2) worked more than forty (40) hours in a week, but did not receive overtime pay." The complaint alleges that, during the limitations period, plaintiff worked as an Associate (from September 2008 through January 2009) and then as a Store Manager (from February 2009 through May 2009).

### DISCUSSION

**I. Motions to Strike Class Allegations**
Defendant brings its motion to strike class allegations pursuant to Rule 23(c)(1)(A) and (d)(1)(D). Rule 23(c)(1)(A) provides that the court, "[a]t an early practicable time ..., must determine by order whether to certify the action as a class action." Rule 23(d)(1)(D) provides that, "[i]n conducting an action under this rule, the court may issue orders that ... require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." District courts, both within this district and others, have held that a motion to strike class allegations, made pursuant to these provisions, is an appropriate device to determine whether the case will proceed as a class action. *E.g., Muehlbauer v. General Motors Corp.,* 431 F.Supp.2d 847, 870 (N.D.Ill.2006); *Cornette v. Jenny Garton Ins. Agency, Inc.,* No. 2:10–CV–60, 2010 U.S. Dist. LEXIS 52809, at \*4 (N.D.W.Va. May 27, 2010).

Plaintiff argues that motions to strike class allegations are disfavored, and that the proper course of action is to oppose the plaintiff's motion for class certification. *E.g., Thorpe v. Abbott Laboratories, Inc.,* 534 F.Supp.2d 1120, 1125 (N.D.Cal.2008); *Korman v. Walking Co.,* 503 F.Supp.2d 755, 762 (E.D.Pa.2007). It is true that where the dispute is factual and discovery is needed to determine whether a class should be certified, it may be premature to strike class allegations. But when the defendant advances a legal argument based on the pleadings, discovery is not necessary for the court to evaluate whether a class action may be maintained. Particularly given that Rule 23(c)(1)(A) instructs

Wright v. Family Dollar, Inc., Not Reported in F.Supp.2d (2010)

16 Wage & Hour Cas.2d (BNA) 1773

courts to determine whether a class may be certified "[a]t an early practicable time," courts may—and should—address the plaintiff's class allegations when the pleadings are facially defective and definitively establish that a class action cannot be maintained.

## II. Legal Standards

**\*2** Rule 23 requires a two-step analysis to determine whether class certification is appropriate. First, plaintiffs must satisfy all four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Failure to meet any one of these four requirements precludes class certification. *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006). Further, plaintiffs must satisfy at least one provision of Rule 23(b). In the instant case, plaintiff seeks monetary damages and therefore must satisfy Rule 23(b)(3), which requires the plaintiff to establish that questions of law or fact common to class members do not predominate over any questions affecting only individual class members.

In determining whether class certification is appropriate, a district court does not presume that all well-pleaded allegations are true and can look beneath the surface of a complaint to conduct the inquiries Rule 23 requires. *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 677 (7th Cir.2001). Even when the defendant initiates the court's review of class allegations, the burden remains on the plaintiff to establish that the suit may be maintained as a class action. *See Oshana,* 472 F.3d at 513, *citing Trotter v. Klincar,* 748 F.2d 1177, 1184 (7th Cir.1984) ("it is the plaintiff's burden to prove the class should be certified"); *but see Ramos v. U.S. Bank Nat. Ass'n,* No. CV 08–1150–PK, 2009 WL 3834035 (D.Oreg. Nov. 16, 2009) ("[I]n the context of a motion to *strike* class allegations, in particular where such a motion is brought in advance of the close of class discovery, it is properly the defendant who must bear the burden of proving that the class is not certifiable."); *Romano v. Motorola, Inc.,* No. 07–CIV–60517, 2007 WL 4199781, at \*2 (S.D.Fla. Nov.26, 2007) ("Defendants, in contending that class certification in this case is precluded as a matter of law, have the burden of demonstrating from the face of plaintiffs' complaint that it will be impossible to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove.") (internal citation and quotation omitted).

## III. Analysis

Defendant argues that plaintiff can establish neither adequacy of representation nor typicality. Because the court agrees, defendant's motion to strike class allegations is granted.

### A. Adequacy of Representation

Defendant correctly contends that, as it is clear from the complaint that the putative class is permeated by conflicts of interest, plaintiff's counsel will not be able to adequately represent all the members of that class. Two distinct varieties of conflict exist. The first is between those associates who were promoted to managers, and the associates who worked under those managers. The most obvious example, based on the pleadings, is plaintiff (who was an associate and then became a manager within the relevant limitations period) but an identical conflict will also arise between any other associates who were promoted to manager and the associates who worked for those managers. [1] The complaint alleges that requiring associates to work off-the-clock was the "only solution" to the manager's dilemma and that this practice was "rampant." Therefore, based on the pleadings, plaintiff, along with other managers, must have required associates to work off-the-clock when she worked as a store manager. As a result, any member of the putative class who reported to plaintiff would be claiming that plaintiff acted in violation of the law and of defendant's policies (and any class member who reported to another class member would be accusing that class member of identical unlawful conduct).

**\*3** The second type of conflict is between all putative class members who, like plaintiff, are no longer employed by defendant, and putative class members who presently work as managers. The conflict arises because plaintiff alleges that managers violated both defendant's policies and Illinois law, which could have a negative effect on current store managers' employment.

The court agrees with defendant that conflicts in the putative class prevent plaintiff from establishing adequacy of representation. Because plaintiff became a manager who allegedly participated in the wrongful conduct at issue, her counsel cannot adequately represent a class of associates. *See Mateo v. V.F. Corp.,* No. C 08–05313, 2009 U.S. Dist. LEXIS 105921, \*13 (N.D.Cal. Oct. 27, 2009) (denying certification under the FLSA because the putative class included the plaintiff and those she supervised, and the defendant's defense that the plaintiff worked employees off-the-clock during their breaks in violation of the defendant's policy brought into question the adequacy of the named

Wright v. Family Dollar, Inc., Not Reported in F.Supp.2d (2010)

16 Wage & Hour Cas.2d (BNA) 1773

---

plaintiff's representation), *quoting J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.,* 628 F.2d 994, 999 (7th Cir.1980); *Sample v. Aldi,* No. 93 C 3094, 1994 U.S. Dist. LEXIS 1518, at *13 (N.D.Ill. Feb. 15, 1994) ("[I]t is generally true that supervisory and nonsupervisory employees should not be placed in the same class.").

Plaintiff argues that no conflict exists because she does not seek damages for the period of time she was a manager; she further notes that the existence of potential wage and hour claims she might have for her tenure as a manager do not destroy adequacy of representation. Because the conflict is not based on any claims plaintiff may have for the time she worked as a manager, plaintiff's arguments are irrelevant and nonresponsive.

**B. Typicality**

Defendant also correctly argues that, because it has unique defenses against plaintiff and any other class member who became a manager, the pleadings show plaintiff cannot establish typicality. Under the typicality analysis, "a plaintiff against whom the defendants have a defense not applicable to other members of the class is not a proper class representative." *Hardy v. City Optical Inc.,* 39 F.3d 765, 770 (7th Cir.1994); *see Robles v. Corporate Receivables, Inc.,* 220 F.R.D. 306, 309 (N.D.Ill.2004) (finding that unique defenses destroy typicality because "the defenses against the named representatives are likely to usurp a significant portion of the litigant's time and energy, and there is a danger that the absent class members will suffer if their representative is preoccupied with defenses unique to it") (internal citations and quotations omitted). One of defendant's theories is that managers who promoted off-the-clock work did so without defendant's knowledge and in violation of its official policy; thus, defendant's litigation strategy will force plaintiff and any other members of the putative class who became managers to defend their own conduct. Defendant has offered two affirmative defenses that implicate this issue. The first is: "Plaintiff is not a proper class representative, as she was a Store Manager during part of her employment with Defendant. As Store Manager, Plaintiff would have been responsible for the failure to pay overtime and the requirement to work off-the-clock as alleged in the Complaint." The second is that "[a]ny Store Manager who required employee[s] to work off the clock did so in violation of Family Dollar's policy prohibiting off the clock work and without Family Dollar's knowledge." These defenses, unique as to plaintiff and any other manager in the putative class, prevent plaintiff from establishing typicality and therefore from showing that she will be able to maintain a class action.

*CONCLUSION*

**\*4** For the reasons discussed above, the court grants defendant's motion to strike class allegations.

**Parallel Citations**

16 Wage & Hour Cas.2d (BNA) 1773

---

Footnotes

1    An affidavit provided by defendant shows that, from June 11, 2005, to June 11, 2010, 13 associates at the store where plaintiff worked were promoted to store manager, one of whom is still employed as a store manager.

---

End of Document     © 2013 Thomson Reuters. No claim to original U.S. Government Works.

80 Empl. Prac. Dec. P 40,416

2000 WL 1207408
United States District Court,
N.D. Illinois, Eastern Division.

Annette M. ALLEN, Shelley S. Burnette,
Earnest Leonard, Brian R. Marshall and
Rahpre Newberry, on behalf of themselves
and all other similarly situated, Plaintiffs,
v.
CHICAGO TRANSIT AUTHORITY, Defendant.

No. 99 C 7614.　|　July 31, 2000.

Opinion

### MEMORANDUM OPINION AND ORDER

CONLON, J.

**\*1** Annette M. Allen, Shelley S. Burnette, Earnest Leonard, Brian Marshall and Rahpre Newberry ("plaintiffs") sue the Chicago Transit Authority ("the CTA") for employment discrimination and retaliation. In their second amended complaint, plaintiffs allege they have been denied promotions, equal pay, and other substantial employment benefits by the CTA on the basis of race in violation of Title VII (Count I) and 42 U.S.C. § 1983 (Count II). In Counts III–V, plaintiffs allege they were harassed in retaliation for filing discrimination charges in violation of Title VII and § 1983. Plaintiffs move for class certification pursuant to Fed.R.Civ.P. 23.

### BACKGROUND

#### I Procedural history
Plaintiffs originally filed their class action complaint November 23, 1999. Plaintiffs filed an amended complaint February 15, 2000. In their first amended complaint, plaintiffs alleged they have been denied promotions, equal pay, and other substantial employment benefits by the CTA on the basis of race, in violation of Title VII (Count I) and 42 U.S.C. § 1981 (Count II). In Counts III–V, plaintiffs alleged they were harassed in retaliation for filing discrimination charges also in violation of Title VII and § 1981. On April 19, 2000, this court dismissed plaintiffs' § 1981 claims on the ground that § 1981 neither expressly nor impliedly contains a private cause of action. This court also dismissed Newberry's Title

VII allegations of retaliation (Count V) arising before January 25, 2000 with prejudice and Marshall's Title VII claims (Count I) without prejudice. On May 31, 2000, this court granted plaintiffs leave to file a second amended complaint. Plaintiffs reasserted the allegations from the first amended complaint and substituted 42 U.S.C. § 1983 as the basis for their § 1981 claims. The CTA then moved to dismiss plaintiffs' § 1983 claims, Newberry's claims, and to bar Allen's and Burnette's § 1983 claims as untimely. On July 24, 2000, this court dismissed plaintiffs' § 1983 retaliation claims but denied the CTA's motion to dismiss in all other respects. The motion to bar Allen's and Burnette's § 1983 claims was denied. Plaintiffs move for class certification on their Title VII and § 1983 discrimination claims (Counts I and II). The CTA objects on multiple grounds.

#### II Factual background
In evaluating a motion for class certification, the court accepts the supporting allegations as true and does not examine the merits of the case *Heastie v. Community Bank,* 125 F.R.D. 669, 671, n. 2 (N.D.Ill.1989). However, the class determination generally involves both factual and legal issues, and may require probing behind the pleadings to determine whether the interests of absent parties are fairly encompassed within the named parties' claims. *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 160 (1982); *see also Betts v. Sundstrand Corp.,* 1999 WL 436579 (N.D.Ill.1999) (considering evidence submitted in making class certification determination); *Orlowski v. Dominick's Finer Foods, Inc.,* 172 F.R.D. 370 (N.D.Ill.1997) (same).

#### A The parties
**\*2** The CTA is an Illinois municipal corporation engaged in the business of providing public transportation in Chicago. The CTA is generally organized into three branches: management and performance; customer service, facilities and development; and transit operations. Each of these branches contains a number of departments. The human resources division is within the management and performance branch and has authority for promotions, advancements, and salary decisions. CTA employees are divided into two categories: exempt or not exempt. Exempt employees are not subject to the minimum wage and maximum hour requirements of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* All non-union employees are exempt and all exempt employees are non-union. The CTA has approximately 1258 exempt employees. Of the exempt employees, approximately 473 are African–American.

Allen v. Chicago Transit Authority, Not Reported in F.Supp.2d (2000)

80 Empl. Prac. Dec. P 40,416

Plaintiffs are African–American CTA employees who are exempt employees or have sought promotion to the exempt ranks. Allen and Burnette are senior personnel specialists in the human resources division. Allen has worked for the CTA since March 1986 and Burnette since June 1987. Leonard is a duplicator operator III in the communications department. Leonard has worked for the CTA since 1991. Marshall is currently the professional programs coordinator within the training department and has worked for the CTA since 1989. Newberry is a communications specialist in the management information systems department and has worked for the CTA since 1990.

**B The CTA's promotion and pay procedures**
Promotion opportunities into and within the exempt ranks and pay increases take place in various ways, none of which are used consistently. These methods are (1) posting a job and allowing employees to bid on it; (2) transferring or promoting a current employee; (3) hiring from outside the CTA; and (4) upgrading a current employee from one level to another. If a position is filled through any method other than posting, there is not a formal process for notifying and reviewing applicants or potential applicants for the position. Hiring managers within individual departments determine the decisionmaking process and decide whether or not to post vacant positions internally. Some departments post all positions, some decide whether to post on a case-by-case basis and others do not post positions at all. Under any of the methods, no one can be promoted or hired without the approval of the vice president of human resources (also called vice president of employee services division) and/or the general manager of personnel services. Once a candidate has been selected, the manager must explain in writing the reasons for the selection and submit all paperwork relating to the selection to the vice president of employee services. Similarly, all salary adjustments, pay increases and bonuses must be approved by the same individuals. Prior to January 1, 2000, Thomas Czech, who is white, was vice president of human resources and approved and signed off on all promotion, advancement and salary decisions. Prior to December 1999, Geraldine Tapling, who is white, was general manager for personnel services.

**\*3** The CTA has an anti-discrimination and affirmative action program that applies to all branches, departments and divisions. It is official CTA policy that all terms and conditions of employment, including promotions and compensation, are administered without regard to race.

The stated goal of the affirmative action plan is to reach the point where representation of minority group members are commensurate with their availability in the relevant external labor market. These policies are posted on bulletin boards at all CTA locations and all position postings notify applicants of the policies. The human resources department is responsible for administration of the anti-discrimination and affirmative action policies.

**C Allegations of racial discrimination and retaliation**

**1 Allen and Burnette**
Allen and Burnette claim the CTA denied them promotion opportunities due to their race. It is traditional that openings for exempt positions within the CTA are posted so that existing employees can apply. Allen and Burnette assert the CTA failed to follow a consistent pattern or practice concerning the filling of available open positions in their department. They allege that in 1995, the position of manager of hourly employees was posted as available. Both Allen and Burnette were fully qualified for the position and applied for it. Tapling orally offered the position to Allen but then changed her decision and placed a male non-African-American in the position. They further allege the CTA improperly denied them the manager of salaried employees position in 1997. The manager of salaried employees retired in July 1997. Allen and Burnette were both qualified for the position and expressed interest in applying. However, they were repeatedly informed that the position was to be eliminated and would not be filled. On September 17, 1997, the CTA announced that Patrick Reilly, a white male, was promoted to manager of salaried employees. Reilly had less experience and was less qualified than either Allen or Burnette. Since September 1997, Allen and Burnette have qualified for other promotion opportunities but the CTA filled the positions with less qualified whites.

In September 1997, Allen and Burnette complained to the CTA's affirmative action unit claiming racial discrimination. They allege that the CTA's affirmative action unit found they had been subjected to racial discrimination in promotions, but no action was taken. On October 24, 1997, Allen and Burnette filed discrimination charges with the IDHR and EEOC. They allege that after they initially complained about discrimination, both were harassed by unwarranted disciplinary actions. These actions included warnings and picayune complaints from their supervisors. Allen and Burnette allege they have been selectively disciplined while uncomplaining employees are not disciplined for the same

Allen v. Chicago Transit Authority, Not Reported in F.Supp.2d (2000)

80 Empl. Prac. Dec. P 40,416

conduct. On February 9, 1999, Allen filed an additional discrimination charge with the IDHR and the EEOC complaining of retaliation and received a right-to-sue letter. Burnette filed an additional discrimination charge with the IDHR and the EEOC complaining of retaliation on August 13, 1999, but has not yet received a right-to-sue letter concerning this charge.

**2 Leonard**

**\*4** The CTA hired Leonard in 1991 as a bus driver. At the time he was hired, Leonard had worked in the printing industry for 25 years. In February 1993, Leonard transferred to the CTA's printshop, where he presently works. Leonard alleges that in September 1997, the position of manager of reprographics was posted and he applied. Leonard was not selected and the position was filled by Joseph Mitria, a non-African-American employee with no experience in printing. Within a year of Mitria's promotion, Leonard sought but was denied an upgrade to a grade 5 position within the print department. While the reason given for denying Leonard the upgrade was a lack of funds, he alleges that two white employees with less seniority were given upgrades. In late 1998, a coordinator position was posted for which Leonard asserts he was fully qualified. He applied for the position but was not selected. A non-African-American employee with less experience filled the position. In November 1998, another coordinator position was posted for which Leonard was qualified and he again applied. Despite his qualifications, Leonard was not selected and the position was filled by a non-African-American from outside the CTA.

In August 1998, Leonard filed a complaint of racial discrimination with the CTA's affirmative action unit alleging he had been denied promotions and was harassed due to his race. As a result, Leonard was upgraded to a temporary grade 7 position. After he filed this complaint, Leonard alleges he has been subjected to a campaign of harassment, including a demotion, unwarranted disciplinary warnings and writeups, and interference with other promotion opportunities.

**3 Marshall**

The CTA hired Marshall in 1989 as a professional programs assistant. Marshall is currently a professional program coordinator. Marshall alleges that in late 1997 or early 1998, the CTA established a customer service division and the president of the CTA recommended him for the position of general manager, data research and business outreach. Marshall claims this promotion was vetoed by the vice

president of human resources and the position was not filled. Marshall further alleges that in August 1998, the position of general manager of market development and special events became vacant. The CTA filled the position, without posting it, with a non-African-American who was not as qualified as Marshall. In February 1999, the CTA posted an opening for the position of manager of marketing and Marshall inquired about being promoted. According to Marshall, the position became open in August and he was the most qualified candidate, but the CTA decided not to fill the position rather than offer it to him.

**4 Newberry**

Newberry was hired by the CTA in 1990 as a senior program analyst. Newberry has a degree in data processing and computer sciences. Newberry claims that beginning in 1994, he was consistently assigned to work outside his job description and was not permitted to perform the work of a senior program analyst. Newberry claims he was denied opportunities for pay increases and has been denied the opportunity for advancement and promotion as a result. Newberry further alleges he was paid less than non-African-American senior program analysts in his department. In January 1998, Newberry filed a complaint with the affirmative action unit alleging adverse treatment, including denial of pay increases and promotions that were given to non-African-American analysts. On August 24, 1998, the affirmative action unit found "cause to support [Mr. Newberry's] allegation of race and adverse treatment."

**\*5** Newberry claims the CTA retaliated against him after he initially filed a complaint with its affirmative action unit in January 1997. Newberry alleges that since filing the complaint, he has been subjected to a campaign of harassment, including trumped-up disciplinary charges, constant reassignments, pervasive monitoring and assignments of meaningless jobs outside his classification. As a result of the stress, Newberry was forced to take a six month leave of absence. Newberry asserts that upon his return, the CTA resumed its pervasive monitoring of his every move. He claims no other employee was subjected to this type of surveillance.

**D Class allegations**

Plaintiffs allege the CTA has continuously discriminated against African–American employees in awarding promotions. Plaintiffs claim because of this discrimination, the CTA has frequently declined to award promotions to

80 Empl. Prac. Dec. P 40,416

fully qualified African–American applicants and instead has promoted less qualified non-African-Americans. Plaintiffs claim the CTA has implemented these discriminatory promotion practices in some cases by posting job openings and then promoting non-African-Americans in the place of African–American applicants who are equally or better qualified. In other cases, the CTA has implemented it discriminatory promotion and salary practices by not posting job openings and by placing non-African-Americans in the non-posted positions without affording African–Americans the opportunity of applying. According to plaintiffs, the CTA has paid African–American employees at lower salaries than non-African-Americans at the same level and with comparable seniority. As a result of these practices, a disproportionately high number of African–Americans occupy lower paid jobs with less authority and responsibility, while a disproportionately high number of non-African-Americans occupy the higher paid jobs with more authority. Plaintiffs request that the policies and practices of the CTA be declared to be in violation of Title VII and § 1983 and that the CTA be enjoined from engaging in discriminatory practices and be required to adopt employment practices and policies in accordance with Title VII and § 1983. They also seek back pay, with interest, and attorneys' fees and litigation expenses.

*DISCUSSION*

**I Class action standard**

In order to maintain a class action, plaintiffs must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). Rule 23(a) requires that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). If these prerequisites are satisfied, the court must determine whether one of the standards of Rule 23(b) is met. *Patrykus v. Gomilla,* 121 F.R.D. 357, 360 (N.D.Ill.1988). Plaintiffs seek certification under Rule 23(b)(2), which provides that a class action is proper if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The class determination generally involves both factual and legal issues, and may require a probing behind the pleadings to determine whether the interests of absent parties are fairly encompassed within the named parties' claims. *Falcon,* 457 U.S. at 160. However, in assessing the certification petition, the court does not examine the merits of the case. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 (1974 (court has no authority to examine merits while deciding class certification); *Allen v. Isaac,* 99 F.R.D. 45, 49 (N.D.Ill.1983). Plaintiffs bear the burden of showing that certification is proper. *Trotter v.. Klincar,* 748 F.2d 1177, 1184 (7th Cir.1984). Failure to meet any one of the requirements of Rule 23 precludes certification of the class. *Patterson v. General Motors Corp.,* 631 F.2d 476, 480 (7th Cir.1980).

*6 Plaintiffs seek to certify the following class:

> All African–Americans who have been employed by defendant Chicago Transit Authority at any time since December 29, 1996, and who are, were, or will be adversely affected by the CTA's continuing discriminatory policies and practices of denying equal promotional opportunities, equal pay, and equal terms and conditions of employment to African–Americans in and into the exempt ranks.

The CTA objects to the proposed class on multiple grounds. The CTA claims there are procedural barriers preventing the named plaintiffs from representing the proposed class. Specifically, it claims Leonard's and Newberry's Title VII claims are untimely and without merit. It also contends that neither Allen nor Burnette can represent the class on their Title VII claims because they did not include class-wide allegations in their EEOC charges. The CTA further claims that plaintiffs fail to establish the proposed class meets the prerequisites for certification of Rule 23(a) and (b). The CTA's procedural arguments do not apply to all of plaintiffs' class claims. The CTA's procedural arguments only address problems with plaintiffs' Title VII claims. Regardless of the merits of these arguments, the court must still address whether the proposed class meets the requirement of Rule 23 in regards to plaintiffs' § 1981 claims. *See* Memorandum Opinion and Order of July 24, 2000 (denying the CTA's motion to dismiss plaintiffs' § 1981 claims). Accordingly, the court begins by addressing whether the purported class meets Rule 23 requirements. [1]

Allen v. Chicago Transit Authority, Not Reported in F.Supp.2d (2000)

80 Empl. Prac. Dec. P 40,416

## II Rule 23 requirements

### A Numerosity

Rule 23(a) requires that the proposed class be so numerous that joinder of all members is impracticable. Plaintiffs claim they meet the numerosity requirement because the CTA has over 470 African–American exempt employees, not including former employees and non-exempt employees who wish to be promoted into the exempt ranks. The CTA claims plaintiffs fail to meet the numerosity requirement because they do not allege every African–American employee in the exempt ranks has sought and been denied a promotion on the basis of race. The CTA contends the fact there is a large number of African–American employees by itself is not sufficient evidence of numerosity. It concludes plaintiffs' numerosity argument is based on pure speculation and therefore must fail. The CTA relies on *Cwiak v. Flint Ink Corp.,* 186 F.R.D. 494, 497 (N.D.Ill.1999) in support of its numerosity argument. In *Cwiak,* plaintiff sought to certify a class of persons denied reimbursements for infertility treatments. Plaintiff presented statistics estimating that defendant had employed an estimated 200 women who were infertile. *Id.* In denying certification, the court pointed out that plaintiff had presented no method to predict how many of the estimated infertile persons actually had incurred or would incur expenses relating to infertility. Because plaintiff provided no method to determine the number of potential members who would be actual class members, the court concluded that plaintiff's estimate was purely speculative and did not establish numerosity under Rule 23(a) (1). *Id.* The CTA claims the same reasoning applies here.

**\*7** The CTA's argument has some merit. Plaintiffs only provide an estimate of the number of potential plaintiffs. They provide no method of determining how many of the 470 potential plaintiffs actually claim they were discriminated against on account of race. However, this uncertainty alone is insufficient to prevent certification of the class. While plaintiffs may not rely on conclusory allegations or speculation that joinder is impracticable, the complaint need not specify the exact number of persons included in the class. *Allen v. City of Chicago,* 828 F.Supp. 543, 550 (N.D.Ill.1993). Plaintiffs must show some evidence of the number of class members; if plaintiffs cannot provide precise numbers, a good faith estimate is sufficient to satisfy the numerosity requirement. *Id.* quoting *Long v. Thornton Township High. Sch. Dist. 205,* 82 F.R.D. 186, 189 (N.D.Ill.1979). Furthermore, the court is entitled to make common sense assumptions when determining the class is

so numerous that joinder is impracticable. *Buycks–Roberson v. Citibank Federal Savings Bank,* 162 F.R.D. 322, 329 (N.D.Ill.1995). In *Cwiak,* the court pointed to problems with plaintiffs' statistics leading to the estimate of 200 and pointed out the record revealed only nine identifiable class members. *Cwiak,* 186 F.R.D. at 497. Here, plaintiffs allege the CTA has over 470 African–American employees and that it has engaged in a pattern or practice of widespread discrimination. Plaintiffs further claim that discovery has revealed more than three dozen other CTA employees who have filed complaints alleging discrimination. Based on plaintiffs' allegations, the class could contain many more members than that. This is sufficient. Classes of this size have been determined to meet the numerosity requirement. *See Marder v. Bank One Milwaukee,* 1995 WL 758413 (N.D.Ill.1995) (forty class members is generally the benchmark rendering joinder impracticable). Accordingly, it appears that the purported class is so numerous that joinder is impracticable

### B Commonality

Rule 23(a)(2) requires plaintiffs to demonstrate that there is at least one question of law of fact common to the class. *In re VMS Sec. Litig.,* 136 F.R.D. 466, 473 (N.D.Ill.1991). Not all factual or legal questions must be common to all class members. Plaintiffs need only demonstrate that there is at least one issue of law or fact common to all class members. *Allen,* 828 F.Supp. at 551. Thus, class certification cannot be defeated solely because there are some factual variations among the claims of individual members. *Patterson,* 631 F.2d at 481. Where a question of law refers to standardized conduct by defendants toward members of the proposed class, a common nucleus of operative facts is typically presented and the commonality requirement is usually met. *Allen,* 828 F.Supp. at 551 (citing *Patrykus,* 121 F.R.D. at 361). Because racial discrimination is by definition class discrimination, class actions are particularly appropriate in cases dealing with allegations of racial discrimination. *Falcon,* 457 U.S. at 157. However, "it is settled law that a person of a given racial group may not represent other members of the group merely because they were all subjected to the same broad type of discrimination by a common employer." *Allen,* 828 F.Supp. at 551. In *Falcon,* the Supreme Court noted that "the mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer." *Falcon,* 457 U.S. at 159 n. 15.

Allen v. Chicago Transit Authority, Not Reported in F.Supp.2d (2000)

80 Empl. Prac. Dec. P 40,416

**\*8** Plaintiffs fail to meet the commonality requirement. There are too many individual issues for there to be factual or legal issues common to the entire class. The purported class includes all exempt CTA employees, with hundreds of different jobs in dozens of different departments. Each promotion or pay decision would present a different set of facts for each employee. Plaintiffs have allegedly been denied different promotions and pay increases that require varying qualifications. Many supervisors have made the challenged decisions using different methods and criteria depending on the particular position and department. Even though all plaintiffs claim racial discrimination, "[t]he issue of whether a particular job assignment or promotion denial was discriminatory would depend upon any number of factors peculiar to the individuals competing for the vacancy, including relative seniority, qualification, availability for work and desire to perform the job." *Patterson,* 631 F.2d at 481. This is apparent from the named plaintiffs' varying allegations. For example, the decision not to promote Marshall to a general manager position was not made by the same person or on the same criteria as the decision to deny Leonard an exempt position in reprographics. "In other words, the plaintiff['s'] claims do not relate to general policies or practices which are allegedly discriminatory, but rather to individualized claims of discrimination which could not possible present common questions of law or fact sufficient to justify class action treatment." *Id.* Commonality is not met under these circumstances.

Courts have rejected certification in similar situations. *Allen v. City of Chicago,* 828 F.Supp. 543, ten named plaintiffs sought to certify a class of "all Black and Hispanic City of Chicago employees who were laid off, discharged, demoted or were adversely affected as a result of the City's reorganization of its work force ..." *Id.* at 550. The court determined that the facts alleged in the complaint described individualized claims of discrimination which did not present common questions of fact or law sufficient to justify class certification. *Id.* at 552. The court observed:

> Indeed, resolution of the merits of the instant dispute will require independent consideration of each plaintiff's qualification for his or her position, their previous work performance and duties, as well as the qualifications and work history of the white employees allegedly granted preferential treatment. Moreover, each of these considerations must

be viewed in light of the employment conditions within each city department, which individually determined which employees would be affected by the reorganization.

*Id.* The court concluded that in the absence of a discriminatory policy or practice of general application, such as a biased testing procedure, plaintiffs did not satisfy the commonality requirement. *Id.*

In *Betts v. Sundstrand Corp.,* 1999 WL 436579 (N.D.Ill.1999), twelve plaintiffs sought to certify a class of "all African–American persons who have unsuccessfully sought employment with defendant at its Rockford facility ..." *Id.* at \*1. In rejecting the putative class, the court determined the fact that defendant's human resources personnel were partially responsible for the hiring process was not sufficient evidence of a centralized hiring process sufficient to establish commonality. *Id.* at \*6. The court concluded "[t]he lack of a centralized hiring decision maker, the sheer number of managers who hire applicants, and the wide range of jobs included in the prospective class, indicate the lack of a common nucleus of operative fact between class members."

*Id.* at \*7. Similarly, in *Gorence v. Eagle Food Centers,* 1994 WL 445149 (N.D.Ill.1994), the court refused to certify a class of "all present and future Eagle employees at the level of assistant store manager and above who were demoted, denied promotions or compensation ... because of their age and/or sex." *Id.* at \*5. The court recognized that whether defendant had discriminated against plaintiffs in refusing to promote them would involve investigation into each individual's qualifications and work history. It stressed "[t]his is not a situation where a group of similarly situated individuals has been denied promotions to jobs requiring the same qualification and skills, at the same position or level, at the same time, by one set of decisionmakers." *Id.* Rather, "plaintiffs seek to represent all present and future Eagle employees at the level of assistant store manage and above." *Id.* Because there was no standardized conduct to examine, there was no common nucleus of operative facts and the court determined the class could not meet the commonality requirement. *Id.* This case is similar to *Allen, Betts* and *Gorence.* Because promotion and pay decisions are made in different ways by different people throughout the various departments of the CTA, there is no common nucleus of facts and plaintiffs cannot establish commonality.

*9 Plaintiffs contend the common questions are: has the CTA discriminated against African–Americans in promotions, pay, and terms and conditions of employment? Plaintiffs contend that proof that an employer operates under a general policy of discrimination justifies a class of employees "if the discrimination manifested itself in hiring and promotion practices in the same general fashion such as through entirely subjective decision making processes." *Falcon,* 457 U.S. at 159 n. 15. Plaintiffs claim they have demonstrated that the CTA has a policy of standardless, highly discretionary decisionmaking that discriminates against African–Americans in promotion and salary. They asset their case will be proven by offering testimony and statistical evidence that will establish the CTA discriminates against African–Americans. In support of their argument, plaintiffs offer statistics of African–American under-representation and rely on cases where the court has certified classes based on employers' allegedly standardized conduct. *See Orlowski,* 172 F.R.D. 370 (certifying class of present and former female and Hispanic employees); *Binion v. Metropolitan Pier and Exposition Auth.,* 163 F.R.D. 517 (N.D.Ill.1995) (certifying class of African–American employees); *Buycks–Roberson v. Citibank Federal Savings Bank,* 162 F.R.D. 322 (N.D.Ill.1995) (certifying class of African–Americans and persons located in primarily African–American locations who were denied home loans due to a subjective decisionmaking process); *Meiresonne v. Marriott Corp.,* 124 F.R.D. 619 (N.D.Ill.1989) (certifying class of female managers allegedly discriminated against due to a highly subjective decisionmaking process).

Plaintiffs' arguments are unpersuasive. Unlike the cases they cite, plaintiffs have failed to establish the CTA has a centralized or completely subjective decisionmaking policy. The record shows promotion and pay decisions are made at the level of individual departments by many different people using different methods with varying human resources involvement. The record does not support their claim that Czech was behind all promotions and decisions for all of the CTA's exempt employees in all departments. While Czech was involved in some departments' decisions, he had little to do with the personnel decisions in others. *See* Reply Mem. Ex. 17–20; Resp. Ex. A–G. Furthermore, there are dozens of departments and over 1200 exempt CTA employees. It is unclear how Czech could have exercised control over all personnel decisions on such a large scale. Similarly, the record does not reveal unfettered discretion in the CTA's decisionmakers. The CTA has a written anti-discrimination and affirmative action policy. Managers are

required to put the reasons for their decisions in writing. At most, the record shows that Czech and human resources shared responsibility for promotion and pay decisions with the individual department managers. This is not sufficient to establish a centralized or entirely subjective practice. *See Betts,* 1999 WL 436579 at * 6–7.

*10 Plaintiffs are correct in asserting that a class action may be appropriate where a plaintiff's disparate impact claim is based on an employer's entirely subjective decisionmaking practices. *Falcon,* 457 U.S. at 159. Courts have certified class actions based on anecdotal evidence of discrimination in combination with statistical evidence of minority under-representation. *Buycks–Roberson,* 162 F.R.D. 322; *Meiresonne,* 124 F.R.D. 619. However, plaintiffs' case is more like *Betts* and *Gorence* than *Buycks–Roberson* or *Meiresonne.* Plaintiffs' across-the-board allegations of disparate impact and their proffered statistics do not overcome the essentially individualized nature of the claims they assert. In essence, plaintiffs' claims are too individualized to meet the commonality requirement.

**C Typicality**
In order to certify a class, plaintiffs must also show their claims are typical of the claims of the class. Fed.R.Civ.P. 23(a)(3). Typicality is closely related to the commonality requirement and both considerations sometimes tend to merge. *Falcon,* 457 U.S. at 158 n. 13 (1982). While numerosity and commonality focus on the characteristics of the class, typicality and adequacy of representation focus on the characteristics of the class representatives relative to the class. *Hill v. Gateway 2000, Inc.,* 1996 WL 650631, * 4 (N.D.Ill.1996) (citing 1 H. Newberg, Newberg on Class Actions, § 3.13 at 163 (1985)). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely–Van Camp. Inc.,* 713 F.2d 225, 232 (7 th Cir.1983). While factual differences between claims do not preclude certification, the representatives' claims must arise to the claims of other class members and must be based on the same legal theory. *Id.* To meet the typicality requirement, the named representatives must establish the bulk of the elements of each class member's claims when they prove their own claims. *Allen,* 828 F.Supp. at 552. "If the named plaintiffs' claims are too individualized, such that they do not arise from the same event, practice or course of conduct that gives rise

80 Empl. Prac. Dec. P 40,416

to the claims of the other class member, typicality will not be found." *Gorence,* 1994 WL 445149 at [*] 10.

For many of the same reasons plaintiffs fail to establish commonality, plaintiffs also fail to meet the typicality requirement. The CTA fills positions, promotes employees and makes pay decisions using different methods in its various departments. Due to the individualized nature of each claim, if a named plaintiff can ultimately prove that the CTA discriminated against him or her, the plaintiff will not have established the elements of any other class member's claims. If Allen and Burnette establish that they were more qualified than the non-African-American candidate selected and were denied a manager's position in the human resources department due to their race, this showing would not entitle any other plaintiff to relief. Similarly, if Marshall establishes that Czech vetoed a possible promotion to general manager of data research and business outreach on account of his race, this does not help Leonard, or any other class member, show he was denied an exempt position in reprographics due to discrimination. Each plaintiff will prevail only upon an individualized showing of racial discrimination. As discussed above, "each plaintiff's work history and qualifications must be compared with the qualifications and work history of the workers in his or her department who were allegedly granted preferential treatment, in order to determine whether discrimination occurred. This entails the adjudication of individual fact-specific claims." *Gorence,* 1994 WL 445149 at [*] 10. Furthermore, although plaintiffs argue Czech was personally responsible for all CTA discrimination, only Marshall alleges Czech was actually involved in the decisions to deny his promotion opportunities. As in *Allen,* "the lack of repercussion from claim to claim" derives from the diverse nature of the employment actions in controversy. *Allen,* 828 F.Supp. at 553. In sum, the claims of the named plaintiffs are simply too personal to be typical; they do not have the same essential characteristics as the claims of the entire class.

**D Adequacy of representation**

 **\*11** Rule 23(a)(4) requires that the named plaintiffs adequately and fairly represent the interests of the class as a whole. This determination has two elements: (1) the adequacy of the named plaintiffs' counsel; and, (2) the adequacy of representation provided in protecting the different, separate and distinct interests of class members. *Retired Chicago Police Ass'n,* 7 F.3d at 598. "A class is not fairly and adequately represented if class members have antagonistic or conflicting interests." *Secretary of Labor*

*v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986). The presence of even an arguable defense against the named plaintiffs that is not applicable to the proposed class, can vitiate the adequacy of named plaintiffs' representation. *Buycks–Roberson v. Citibank Federal Savings Bank,* 162 F.R.D. 322, 334 (N.D.Ill.1995).

The CTA does not contest the adequacy of plaintiffs' counsel and the court finds no reason to do so. Plaintiffs have experienced and able counsel. The CTA contests the adequacy of the named plaintiffs. It contends the named plaintiffs are individually inadequate and that there are conflicts within the purported class. Specifically, the CTA claims that neither Newberry nor Leonard can assert viable failure to promote claims individually, and as a result cannot be class representatives. The CTA further contends some plaintiffs have conflicting claims because members of the purported class competed with each other for promotions and some class members are actually responsible for the decisions that are at issue. Plaintiffs claim none of these reasons warrant denial of certification.

The CTA's arguments regarding the strength of the plaintiffs' individual claims is without merit. In *Robinson v. Sheriff of Cook County,* 167 F.3d 1155, 1158 (7th Cir.1999), the Seventh Circuit acknowledged that if a named representative's claim is a *"clear* loser at the time asks to be made class representative" the weakness of his claim can be a reason to deny certification. This is not the case here. None of the named plaintiffs' claims are clearly without merit. In its brief in opposition to class certification, the CTA references motions for summary judgment filed regarding Newberry's and Leonard's claims. However, an examination into the merits of the case is not permitted on the issue of class certification. *See Eisen,* 417 U.S. at 177.

The CTA's assertion of conflicts within the proposed class is more persuasive. There are two major problems with the proposed class. First, class members competed against each other for some of the denied promotions. For example, it is apparent that Allen and Burnette competed for the same positions in the human resources department. Similarly, other African–Americans applied for promotions sought by Leonard. Considering that plaintiffs' purported class contains all exempt workers in all CTA departments, it is likely there are many situations where class members applied for the same promotions. This conflict between class members counsels against certification. *See Allen,* 828 F.Supp. at 553 (named plaintiffs were not adequate representatives where

Allen v. Chicago Transit Authority, Not Reported in F.Supp.2d (2000)

80 Empl. Prac. Dec. P 40,416

"the expansive class definition makes it likely that members of the putative class may have competed with one or more of the representative parties for a single position or promotion"). Furthermore, some purported class members are responsible for decisions not to promote other class members. The interests of the class members who are responsible for some of the challenged decisions conflict with the interests of class members who are challenging those decisions. *See Retired Chicago Police Ass'n,* 7 F.3d at 598 (named plaintiffs were not adequate representatives where putative class member made the challenged decisions). For example, it appears that Burnette actually participated in the decision to deny Leonard's third promotion. Considering that the proposed class includes exempt employees from all departments at all levels, it is likely there are many instances where class members were partially responsible for decisions challenged by other class members. In light of these conflicts, the named plaintiffs are not adequate representatives of the proposed class.

**\*12** Plaintiffs' arguments otherwise are unpersuasive. Plaintiffs rely on *Meiresonne v. Marriott Corp.,* 124 F.R.D. 619, 625 (N.D.Ill.1989) to counter the CTA's argument regarding competition for the same position by class members. In *Meiresonne,* the court rejected the argument that the named plaintiffs could not adequately represent the class because class members may have competed with each other for promotions. *Id.* However, the danger of conflict is greater here than in *Meiresonne.* Here, two of the five named plaintiffs twice applied for the same position. These are the only two promotions Allen and Burnette specifically identify they were denied. Moreover, this court relied on this argument in a similar situation in *Allen,* which was decided four years after *Meiresonne.* 828 F.Supp. at 553.

The court concludes the conflicts between class members prevent the named plaintiffs from adequately representing the interests of the entire class. Thus, plaintiffs fail to meet the requirements of Rule 23(a)(4). Because the court has determined that plaintiffs have failed to meet the requirements of Rule 23(a), it need not address the requirements of Rule 23(b).

### *CONCLUSION*

The motion for class certification is denied.

**Parallel Citations**

80 Empl. Prac. Dec. P 40,416

Footnotes

1    Because the court finds the CTA's Rule 23 arguments dispositive, it does not address the purported procedural flaws in the named plaintiffs' claims.

End of Document    © 2013 Thomson Reuters. No claim to original U.S. Government Works.