1         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION
3
4   BRIAN LUCAS, JOE EAGLE, MICHAEL)
    KEYS, ANTWOIN HUNG, and JAMES  )
5   ZOLLICOFFER, on behalf of      )
    themselves and similarly       )
6   situated laborers,             )
                     Plaintiffs;   )
7                                  )
                                   )
8      -v-                         )No. 1:12 CV 09672
                                   )
9                                  )
    VEE PAK, INC., STAFFING NETWORK)
10  HOLDINGS, LLC, PERSONNEL       )
    STAFFING GROUP, LLC, d/b/a MOST)
11  VALUABLE PERSONNEL, d/b/a MVP  )
    and ALTERNATIVE STAFFING, INC.,)
12  d/b/a ASI,                     )
                     Defendant.    )
13
14
15        The Discovery Deposition of KYLE CARSTENSEN,
16  taken before Beth Radtke, RPR, CRR, within and for
17  the State of Illinois, pursuant to the provisions of
18  the Federal Rules of Civil Procedure of the United
19  States District Court, pertaining to the taking of
20  depositions, taken at 222 North LaSalle Street,
21  Chicago, Illinois, commencing at the hour of
22  approximately 9:16 a.m. on the 12th day of July,
23  2018.
24

1  Q. Does Mr. Swerdloff come around the office
2  much?
3  A. Yes.
4  Q. How frequently does he come around the
5  office?
6  A. Three days a week, on average.
7  Q. And since January and February, you haven't
8  spoken to Mr. Swerdloff about the lawsuit at all?
9  A. Yes, in regards to logistics of me going to
10 the deposition.
11  Q. Prior to the case being settled and this
12 conversation in January or February when he told you
13 it was settled and you would be deposed, when was the
14 previous time that you spoke to Mr. Swerdloff about
15 the lawsuit?
16  A. I spoke to him when he told me that we --
17 well, in '13 when we had -- got served, and then the
18 next time we spoke about it was when we were -- he
19 asked me to go to JAMS.
20  Q. And when you spoke with him after the
21 complaint was served, what did Mr. Swerdloff say to
22 you?
23  A. He said that we were -- are part of the
24 lawsuit with Vee Pak and two other staffing agencies

Page 28

1    for alleged discrimination.
2        Q.   And what did you say to Mr. Swerdloff?
3        A.   I asked him if it was actually true.
4        Q.   And what did he say?
5        A.   He said yes, it was.
6        Q.   And what else did you say to each other?
7        A.   I said if this practice is continuing today,
8    it stops immediately.
9        Q.   What practice are you talking about?
10       A.   If there is discrimination with -- happening
11   at Vee Pak.
12       Q.   What did Mr. Swerdloff say to you?
13       A.   He said I agree.
14       Q.   And what else did you guys talk about in
15   relation to the lawsuit?
16       A.   Specifically for our conversation regarding
17   the lawsuit and the discrimination or in general
18   terms?
19       Q.   Just the lawsuit in general.
20       A.   Those were the points --
21       Q.   No, I'm talking about this conversation in
22   2013 when the --
23       A.   When we were served?
24       Q.   When the lawsuit was served on you.

Page 63

1   BY MR. MULHERIN:
2       Q.   Do you have any idea what the net income was
3   in 2015?
4            MS. FLOTTE:  Objection, relevance.
5   BY THE WITNESS:
6       A.   The only thing I can tell you is from 2013
7   through 2015, because we were -- had to write off the
8   amounts that we did, it was a financial -- huge
9   financial impact on us, and how I know that is
10  because of what we had to cut in expenses and not be
11  able to hire and recoup that money out of cash flow.
12  BY MR. MULHERIN:
13      Q.   We'll talk about that.
14           So do you recall whether there was a net
15  income in 2015?
16      A.   I do not.
17           MS. FLOTTE:  Objection -- objection,
18  relevance.
19           THE WITNESS:  I'm sorry.
20  BY MR. MULHERIN:
21      Q.   Do you recall whether there was a net income
22  in 2014?
23           MS. FLOTTE:  Objection, relevance.
24

Page 64

1  BY THE WITNESS:
2      A.   I don't recall.
3  BY MR. MULHERIN:
4      Q.   So when you talk about financial
5  difficulties, you're not foreclosing the fact that
6  the company could have incurred -- or experienced a
7  net income in 2015?
8           MS. FLOTTE:  Objection, form.
9  BY THE WITNESS:
10     A.   What I was saying is I knew -- I don't know
11 specifically at that time what our financial position
12 was.  I just knew that in discussions with Steven,
13 that we were in a financial bind because of the
14 bankruptcies that we incurred.
15 BY MR. MULHERIN:
16     Q.   And -- but during that period of time, you
17 did not experience a decrease to your salary,
18 correct?
19          MS. FLOTTE:  Objection, misstates testimony,
20 form.
21 BY THE WITNESS:
22     A.   Did I experience a salary decrease.
23 BY MR. MULHERIN:
24     Q.   Okay.  And so what year did you experience a

Veritext Legal Solutions
www.veritext.com                                        888-391-3376

Page 65

1  salary decrease?
2      A.  I don't remember the timeframe.  It was
3  sometime during that period where I did not take a
4  couple paychecks.
5      Q.  How many paychecks was it?
6      A.  I don't know for sure.  I think it was two.
7      Q.  Who asked you to do that?
8      A.  Steven Swerdloff.
9      Q.  And what year was it?
10     A.  I don't recall the year.  Sometime between
11 '13 and '15.  I really don't recall.
12     Q.  Did you receive additional payments in the
13 future to pay you back for those two paychecks?
14     A.  No, I did not.
15     Q.  Did you receive additional payments in a
16 bonus to pay you back for those paychecks?
17     A.  The bonuses that I received were based on my
18 employment contract.
19     Q.  And when you say your employment contract,
20 there are specific metrics in your employment
21 contract that you needed to meet to receive a bonus?
22     A.  Yes.
23     Q.  And what are those metrics based on?
24     A.  Net income.

Veritext Legal Solutions
www.veritext.com                                     888-391-3376

Page 138

1    Q.   But you were not at Vee Pak when this
2    incident occurred --
3    A.   I was not --
4    Q.   Sorry, just let me finish.
5    A.   Sure.  Sorry.
6    Q.   No, no, it's okay.  We've only said a
7    million words combined at this point.
8         So tell me about this Carmen Hernandez
9    incident.
10   A.   Carmen called me.  It was a particular day
11   that we brought in ten African American men that were
12   for our order.  We actually ended up being over what
13   Vee Pak ordered, and I don't know if the other
14   agencies were short that day.
15        What I can tell you is that we were over.
16   Carmen approached a supervisor, Joe, on second shift,
17   and the ten African American individuals were behind
18   Carmen when she approached Joe.  She said, Joe, we
19   are ten over.  Can you utilize these gentlemen for
20   work today?  And Joe, in a very hostile yelling tone
21   said to Carmen, Get these fucking Black people out of
22   here.
23   Q.   Was it ASI's mistake to send those ten
24   additional employees?

Page 141

1   MR. MULHERIN:  Let's mark this as Exhibit 5.
2         (Exhibit No. 5 was marked for
3          identification.)
4   BY MR. MULHERIN:
5      Q.   Sir, if you look at this document, do you
6   recognize it?
7      A.   Yes, I do.
8      Q.   And so in particular, the second document,
9   is that the written statement that you're talking
10  about?
11     A.   Yes.
12     Q.   And this was created on the same day that
13  this alleged event occurred, correct?
14     A.   To the best of my knowledge, yes.
15     Q.   And so you see in here it says at the very
16  bottom "In a very angry voice, he said get those
17  Black guys out of here"?
18     A.   Yes.
19     Q.   Do you have a specific knowledge of Carmen
20  telling you -- and was it Joe Stasiunis?  Is that the
21  name, Joe?
22     A.   I don't recall his last name.  It sounds
23  right.
24     Q.   And do you have a specific knowledge of

Page 142

1  Carmen telling you that Joe Stasiunis said "Get those
2  fucking Black guys out of here"?
3     A.   That's what Carmen said to me over the
4  phone.
5     Q.   But you wouldn't have any personal knowledge
6  as to whether Joe actually said that?
7     A.   I believe Carmen's statement to me to be
8  truthful and accurate.  It's in her nature to be
9  truthful and accurate, so what she told me on the
10 phone I believed to be truthful.
11    Q.   Would you expect her to be truthful and
12 accurate in her written statement?
13    A.   Yes, I would be, in the sense that -- but
14 without the -- she's the type of person that doesn't
15 swear, so her telling me exactly what happened on the
16 phone is what happened, but for her to write
17 something like that is not just who she is.  She's
18 the kind of a person who wouldn't do that.
19    Q.   Do you recall having a conversation with Vee
20 Pak's counsel about this alleged incident?
21    A.   With Carmen in particular?
22    Q.   No, with counsel for Vee Pak, do you
23 remember having a conversation with counsel for Vee
24 Pak about this alleged incident?

Page 144

1  Q. So then in terms of your examples that you
2  had stated earlier on that you had communicated to
3  Denlow, you had mentioned something about DNRs. What
4  is it exactly that you told Judge Denlow about DNRs?
5  A. DNR is a do not return, and I noticed that
6  since about 2013 or around that time period when we
7  were taking on more orders, that there happened to be
8  more do not returns for African Americans than
9  non-African Americans.
10  Q. Tell me how you came to that conclusion.
11  A. I came to that conclusion based upon Vee Pak
12  sending in their do not returns to our agency and I
13  noticed a large volume of do not returns that
14  happened to be African American.
15  Q. When you say "large volume," do you have any
16  percentage as to the percentage of DNRs that were
17  given to African Americans as opposed to Hispanics?
18  A. No, I do not, and maybe "large volume" is
19  not the correct terminology, but more than
20  non-African Americans.
21  Q. Do you have any reason to believe that the
22  DNRs you read were not valid?
23  A. I just made the comment that there was more
24  for African Americans than there were for Hispanics.

Page 153

1  BY MR. MULHERIN:
2      Q.   This example.  We're talking about this
3  example.  The only reason you think this was
4  discriminatory is because there were more African
5  Americans in the DNRs, right?
6           MS. FLOTTE:  Objection, misstates the
7  testimony, form.
8  BY THE WITNESS:
9      A.   Yes.
10 BY MR. MULHERIN:
11     Q.   So you had mentioned there was a third
12 example.  What is that third example?
13     A.   That third example is with an interaction I
14 had with Juan Montoya.  It was a -- he was the first
15 shift supervisor or second shift; they've gone back
16 and forth.  But it was with Juan Montoya.
17     Q.   And what was this interaction with
18 Mr. Montoya?
19     A.   I was checking in employees for that time
20 period.  I saw Mr. Montoya standing, I believe, on a
21 bunch of pallets observing.  I went over to
22 Mr. Montoya.  I said, How are you doing, Juan?  And
23 he gave a gesture to me -- I don't know if you want
24 to call it disgust, but he made a comment raising his

Page 154

1  hands and said what am I supposed to do with all this
2  -- these people.  And I turned around and there was a
3  large percentage of African Americans that were
4  waiting to clock in.  And I returned to Juan and I
5  said, Juan, they were going to be put to work today
6  and they're going to do a great job for you.  And
7  Juan's response was, Our production is going to be
8  very low today.
9      Q.  So other than the gesture, you know, what
10 else did Mr. Montoya say to you that suggested to you
11 this was somehow discriminatory?
12     A.  He did not say anything else besides the
13 comment he made.  It was in his body language,
14 though, and his referencing of low production and the
15 gesture towards a very -- more predominant African
16 American base right in front of us clocking in.
17     Q.  Were any Hispanics over there?
18     A.  There were some, yes.
19     Q.  And so Mr. Montoya did not say anything
20 about the fact that he did not want African American
21 workers, did he?
22     A.  To me at that particular day, no.
23     Q.  And he never had to you in particular,
24 correct?

Page 155

1     A.  Not to me personally.
2     Q.  And so then this is another situation where
3  you assumed, based on something, that there was a
4  discriminatory act, correct?
5         MS. FLOTTE:  Objection, misstates testimony,
6  form.
7  BY THE WITNESS:
8     A.  He has never made something like that before
9  when there's been Hispanic people or whatever it
10 might be, but it was -- he was pointing and
11 referencing right at African Americans.
12 BY MR. MULHERIN:
13    Q.  And you made the jump that that was somehow
14 related to discrimination?
15        MS. FLOTTE:  Objection, form.
16 BY THE WITNESS:
17    A.  I don't know -- I've never heard him say at
18 any other time "Our production is going to be low
19 today."
20 BY MR. MULHERIN:
21    Q.  So what ties that to the Black guys?  I
22 don't understand.
23    A.  It's actually a group of African Americans,
24 both men and women.

Page 188

1     Q.   And what do you understand based on the
2  facts you acquired afterwards?
3     A.   It came to my knowledge that Vee Pak asked
4  ASI to only send Hispanic temporary laborers.
5     Q.   Let me direct your attention to paragraph 6,
6  if you would read that, please.
7     A.   "Alternative has never refused to assign
8  individuals to Vee Pak on the basis of certain
9  protected characteristics, including but not limited
10 to race, color, national origin, or any other
11 characteristic protected under the law."
12    Q.   Is there anything about the facts you
13 acquired after August 2012 that leads you to believe
14 now that that statement in paragraph 6 is wrong?
15    A.   Yes.
16    Q.   In what respect?
17    A.   Refuse to assign individuals based on race
18 and color.
19    Q.   And what about --
20    A.   Race.
21    Q.   What about that do you understand now to be
22 incorrect?
23    A.   From the knowledge that I've gained after
24 signing this document, I gained knowledge that we --

Page 189

1  ASI was directed not to send -- only to send
2  Hispanics.
3      Q.  Okay.
4      A.  To their location.
5      Q.  Let me direct your attention now to
6  paragraph 7 and ask you to read that.
7      A.  "Vee Pak has never instructed Alternative to
8  refuse to assign individuals to Vee Pak on the basis
9  of certain protected characteristics, including but
10 not limited to race, color, national origin, or any
11 other characteristics protected under the law."
12     Q.  Based on information you've acquired since
13 August of 2012, was there anything you've said in
14 paragraph 7 that you regard as inaccurate?
15     A.  Yes.
16     Q.  And what is that?
17     A.  That Vee Pak never instructed ASI to refuse
18 an assignment on a temporary worker based on race.
19     Q.  And what about that statement do you regard
20 now as incorrect?
21     A.  That Vee Pak did direct Alternative -- from
22 knowledge that I gained after signing this agreement
23 that Vee Pak did instruct ASI to send only Hispanics
24 to their site.

Page 195

1  A. I can only infer what it meant based on past
2  history.
3  Q. And what did you infer from past history?
4  A. Meaning that 65 good ones, which means
5  either people that are there ongoing or people that
6  are actually going to be good and that the remaining
7  people are not going to be good workers for the day.
8  Q. And was there anything about the good ones
9  that you understood from that?
10 A. In the past, it has referred -- has been
11 inferred to African Americans.
12 Q. "Good ones" referred to as African
13 Americans?
14 A. No, bad ones -- or non-good ones referred to
15 African Americans.
16 Q. And so when you see it says "Only 65 good
17 ones LOL," what did you understand that to mean?
18 A. I took it as meaning that he is making a
19 comment -- the LOL is laughing out loud; I think
20 that's universal for everyone. That we're only going
21 to have 65 that are going to be good people that are
22 probably the people that have been working
23 consistently through the years at Vee Pak on second
24 shift and the remaining portion is probably -- what

Page 196

1    we call people that have not been there and it could
2    be a predominantly African American group of people.
3         Q.   What about the -- was there any change --
4    when did the experience -- expectation of experienced
5    workers start, if you know?
6              MR. MULHERIN:  Objection, foundation.
7    BY MR. SELLERS:
8         Q.   Is there a point where you understood that
9    Vee Pak was asking for experienced workers to be
10   referred by ASI?
11             MR. MULHERIN:  Objection, form.
12             MS. FLOTTE:  You can answer.
13   BY THE WITNESS:
14        A.   Meaning like throughout the tenure of my
15   employment with ASI?
16   BY MR. SELLERS:
17        Q.   Yeah, was that continuous, or did that
18   happen only at a certain point?
19        A.   It -- I really don't have a solid answer for
20   you.  What I know is when we started, when I started,
21   we were the third agency, smallest agency.  We had,
22   like I said earlier, anywhere from 15 to 25 per
23   shift.  We took over MVP in 2013 along with Staffing
24   Network.  Our orders increased more, and we had