Page 1

1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3

4       BRIAN LUCAS, JOE EAGLE, MICHAEL)
        KEYS, ANTWOIN HUNG, and JAMES  )
5       ZOLLICOFFER, on behalf of       )
        themselves and similarly        )
6       situated laborers,              )
                           Plaintiffs;  )
7                                        )
                                         )
8          -v-                          )No. 1:12 CV 09672
                                         )
9                                        )
        VEE PAK, INC., STAFFING NETWORK)
10      HOLDINGS, LLC, PERSONNEL        )
        STAFFING GROUP, LLC, d/b/a MOST)
11      VALUABLE PERSONNEL, d/b/a MVP  )
        and ALTERNATIVE STAFFING, INC.,)
12      d/b/a ASI,                      )
                           Defendant.   )
13

14

15           The Discovery Deposition of JULIE TRACEY,
16      taken before Beth Radtke, RPR, CRR, within and for
17      the State of Illinois, pursuant to the provisions of
18      the Federal Rules of Civil Procedure of the United
19      States District Court, pertaining to the taking of
20      depositions, taken at 444 West Lake Street, Chicago,
21      Illinois, commencing at the hour of approximately
22      10:08 a.m. on the 18th day of May, 2018.
23                    Veritext Legal Solutions
                          Mid-Atlantic Region
                     1250 Eye Street NW - Suite 350
24                       Washington, D.C.  20005

Page 94

1           A.    Mm-hmm.

2           Q.    You went over to speak with Mr. Montoya.

3    Were you able -- and you said there's one room where

4    all the laborers went to get their assignments?

5           A.    It's not actually a room, it's the walkway

6    that leads into the middle room, so people are there

7    assigning people to different lines.

8           Q.    Okay.  But you could see everyone who was

9    there?

10          A.    Correct.

11          Q.    Okay.  And did you see everyone who was

12   there?

13          A.    For the most part, yes.

14          Q.    Okay.  And this was a time when people were

15   waiting to get their assignments?

16          A.    Mm-hmm.

17          Q.    Yes?

18          A.    Yes.

19          Q.    So as far as you understood, this was all

20   the temporary laborers, correct?

21             MR. RICHARDSON:  Objection, foundation and

22   speculation.

23             MS. FLOTTE:  You can answer.

24   BY THE WITNESS:

Page 95

```
 1        A.   Correct.
 2   BY MR. WILLIAMS:
 3        Q.   Including Staffing Network?
 4        A.   Correct.
 5             MR. RICHARDSON:  Same objections.
 6   BY MR. WILLIAMS:
 7        Q.   MVP?
 8             MR. RICHARDSON:  Same, objections.
 9             MR. WILLIAMS:  He's just doing his job.
10   BY MR. WILLIAMS:
11        Q.   Yes?
12        A.   Yes.
13        Q.   And ASI?
14        A.   Correct.
15        Q.   Any other staffing agencies at that time?
16        A.   Not that I'm aware of.
17        Q.   Okay.
18             MR. RICHARDSON:  Chris, whenever you get a
19   second, I've got to use the restroom.
20             MR. WILLIAMS:  Okay.
21   BY MR. WILLIAMS:
22        Q.   Did you notice anything about the people,
23   the laborers who were assigned to Vee Pak on that day
24   and were waiting in that area?
```

Page 96

1           MR. ROTHSCHILD:  Objection, foundation,

2      form.

3           MR. RICHARDSON:  Objection, form and

4      foundation.

5           MS. FLOTTE:  You can answer.

6      BY THE WITNESS:

7           A.   Yes.

8      BY MR. WILLIAMS:

9           Q.   What did you notice?

10          MR. RICHARDSON:  Same objections.

11          MS. FLOTTE:  You can answer.

12      BY THE WITNESS:

13          A.   Predominantly Hispanic.

14      BY MR. WILLIAMS:

15          Q.   Okay.  So the people you saw appeared to be

16      predominantly Hispanic?

17          MR. RICHARDSON:  Same objections.

18      BY THE WITNESS:

19          A.   Mm-hmm.

20      BY MR. WILLIAMS:

21          Q.   Did you see African Americans?

22          A.   Very few.

23          Q.   Could you say as a percentage how many were

24      African American?

Page 109

1           MR. RICHARDSON:  Objection to the timeframe.

2      I'm not sure what time we're talking about.

3           MR. WILLIAMS:  We're still talking 2009 to

4      the 2013-'14 time period.

5           MR. RICHARDSON:  Well --

6           MR. ROTHSCHILD:  I'll -- the question is

7      misleading.  She's talking about the e-mail period --

8           MR. RICHARDSON:  Right.

9           MR. ROTHSCHILD:  And she's not --

10          MR. WILLIAMS:  Fair enough.  Let me strike

11     the question and let me clarify, okay?

12     BY MR. WILLIAMS:

13        Q.   What I'm asking you to do is as you sit here

14     today, thinking about that 2009 to 2013-'14 period,

15     did you notice anything about the pattern of who was

16     DNR'd?

17          MR. RICHARDSON:  Objection, asked and

18     answered.

19

20     BY THE WITNESS:

21        A.   I did not.

22     BY MR. WILLIAMS:

23        Q.   Okay.  So starting after this 2013-'14

24     period, did you notice anything about the pattern of

Page 110

1    who was DNR'd?

2         A.   I do.

3         Q.   What did you notice?

4         A.   Because you're required to read the form,

5    you are able to identify who the person is at the

6    time instead of -- instead of me looking at a group

7    like this, ticket, ticket, ticket, ticket, DNR, DNR,

8    DNR, whoever it may be, now I have to look at the

9    name, look at -- and it's the same client because

10   it's their form.  So yes, I am able to see more

11   clearly who is being DNR'd now versus then.

12        Q.   And who is being DNR'd?

13        A.   A lot of African Americans.

14        Q.   Disproportionate to the number of African

15   Americans being sent?

16             MR. ROTHSCHILD:  Objection, foundation.

17             MR. WILLIAMS:  Strike that.

18   BY MR. WILLIAMS:

19        Q.   Was there anything else that made you

20   believe, informed your opinion that Vee Pak had a

21   preference for a certain race or ethnicity for

22   laborers between 2009 and the 2013-'14 period?

23             MR. ROTHSCHILD:  Objection.  There's no

24   testimony that Vee Pak had a preference by her.

Page 111

1          MR. RICHARDSON:  Objection to form.

2          MS. FLOTTE:  You can answer.

3          THE WITNESS:  Could you repeat your

4     question?

5          MR. WILLIAMS:  Yes.

6     BY MR. WILLIAMS:

7          Q.   Is there anything else that informed your

8     opinion -- well, first let me clarify.

9          I thought, and correct me if I'm wrong, was

10    it your opinion that Vee Pak had a preference for a

11    certain race or ethnicity of laborer in this 2009 to

12    2013-'14 period?

13         A.   That is what I answered, yes.

14         Q.   Is there anything else that informed that

15    opinion that made you think that?

16         A.   Yes.

17         Q.   Okay.  You can tell me.

18         A.   Okay.  In that timeframe, '09 to '14, when

19    we did bring African American people in at the split

20    of shift, now it's a lot of people at the split of a

21    shift.  It's a lot of people.  And the supervisors

22    were in the same place to put people on their lines,

23    and they would look out over the people that were

24    there and just go...

Page 112

1       Q.    Could you describe the face that you just

2    made so that we can get it on the record?  How would

3    you describe it?

4             MR. ROTHSCHILD:  Lack of foundation as to

5    who and when -- you asked her about '09 to '14 and

6    now she's talking about when the change happened with

7    the --

8             MR. WILLIAMS:  Don, I'm going to ask you to

9    put your objection on the record, but it's very clear

10   that I asked her about it and she's responding to the

11   2009 to '14 period.

12   BY MR. WILLIAMS:

13      Q.    Now I will ask to clarify, you said

14   supervisors.  Are you talking about Vee Pak

15   employees?

16      A.    I'm sorry, yes.  Vee Pak shift supervisors

17   at the change of shift between first shift and second

18   shift, when there's the highest concentration of

19   people in the same area, because you have one shift

20   going out and one shift going in, both supervisors,

21   Vee Pak supervisors are there to assign the lines and

22   get the people out.  The -- the expression on their

23   faces was not of a welcoming expression, it was just,

24   Oh, my God, look what I have to work with today.

Page 113

1      Q.   And you're talking about when they were

2   looking at the African American --

3      A.   Yeah.

4      Q.   -- laborers?

5      A.   Mm-hmm.

6           MR. ROTHSCHILD:  Objection, again.

7   Foundation, foundation, foundation.

8   BY MR. WILLIAMS:

9      Q.   Was there anything else that informed your

10  opinion?

11     A.   Yes.

12     Q.   Okay, you can tell me.

13     A.    We had a situation on second shift with the

14  second shift supervisor at the time with a group of

15  our employees that were singled out for being African

16  American and asked them to have my on-site have them

17  leave the premises.

18     Q.   Was your on-site Carmen Hernandez?

19     A.   Mm-hmm, yes.

20          MR. ROTHSCHILD:  Objection, foundation

21  again.

22          MR. WILLIAMS:  I'm going to show you what

23  was previously marked as, I think, Hernandez

24  Exhibit 2.

Page 118

1          Q.   Okay, tell me what it means.

2          A.   If you look at this, it says Vee Pak Report,

3     9-3-14.docx.  That's a premise report that we send

4     every day and it's marked Vee Pak report.

5               So what it is, it's our premise report to

6     let Vee Pak know how many people we have on site for

7     that shift.

8          Q.   Okay.  Do you know if the information on the

9     other page, 43460, was included with that e-mail?

10         A.   I do not remember.

11         Q.   Did you ever see this document, 43460?

12         A.   No.

13         Q.   Okay, then you can set it aside.

14              Let me go back to where we were.  You were

15    describing an incident in which you said African

16    Americans were singled out.

17              Do you recall that?

18         A.   Yes.

19         Q.   Please go ahead.

20         A.   I do recall that, and I'm -- I don't

21    remember if Kyle called me, Carmen called Kyle, or

22    what the series or chain of events was.  We were both

23    in the office at the same time.  She explained --

24         Q.   Let me clarify.  In the ASI office?

Page 119

1          A.    In the ASI Cicero office.

2          Q.    So you were with Kyle at the time?

3          A.    In different offices, but we were in the

4     same building.

5          Q.    But Carmen was at Vee Pak?

6          A.    Correct.  And she explained the incident

7     that Joe had singled them out, moved them off of the

8     production floor --

9          Q.    I'm going to ask you who describe who "them"

10    is.

11         A.    The group of employees who happened to have

12    been African American.  At the time he singled them

13    out, moved them off of the production floor, and

14    explicitly, or however you want to say that, asked

15    Carmen to have them removed to get them off of the

16    facility.

17         Q.    Okay.  And how did you learn of this?

18         A.    I can't remember the series of events.

19    Either Carmen called me or Carmen called Kyle and

20    then we had a conversation about it and then

21    immediately I believe Carmen brought them back to the

22    office so Kyle could speak with them directly.

23         Q.    And do you know were you on speakerphone

24    with Carmen at the time?

Page 120

1          A.    I don't remember.

2          Q.    But you were part of the conversation with

3     Carmen?

4          A.    Like I said, I don't recall if I spoke to

5     Kyle about it or if Carmen spoke to me about it, and

6     I don't remember the chain of events.  I do remember

7     being at the office when it happened, and I do

8     remember either speaking to Kyle or Carmen.  I can't

9     tell you who I got it from first.

10         Q.    Do you know what Carmen's reaction to this

11    incident was?

12         A.    She -- she physically was mortified.  She

13    was -- she was shaken.  She just couldn't -- she

14    couldn't believe it happened.

15         Q.    Do you know why she was so upset?

16         A.    Who does that?  I -- she -- it's not in

17    Carmen's DNA to accept that.  She knew it was

18    completely wrong.

19         Q.    But she did bring the workers back?

20         A.    Well, yeah, she wanted to remove them from

21    any further discrimination.  I mean, that's blatant

22    discrimination.

23         Q.    But it was Vee Pak's choice to send them

24    away?

Page 121

1                    MR. ROTHSCHILD:  Objection, foundation.

2                    MS. FLOTTE:  You can answer.

3          BY THE WITNESS:

4               A.   Yes.

5          BY MR. WILLIAMS:

6               Q.   And Joe is a Vee Pak employee, correct?

7               A.   Yes.

8               Q.   Do you know Jesus Mendoza?

9               A.   I do.

10              Q.   Who is Jesus Mendoza?

11              A.   He was an on-site at Vee Pak up until

12         January of this year.

13              Q.   An on-site working for Alternative Staffing?

14              A.   Alternative Staffing at Vee Pak.

15              Q.   He's not there any longer?

16              A.   No, he resigned.

17              Q.   Do you know why he resigned?

18              A.   He took another job.

19                   MR. WILLIAMS:  Okay.  I'm going to show the

20         witness what was marked yesterday as Gonzales

21         Exhibit 3.  It's the very fine print document,

22         e-mail.

23                   MR. ROTHSCHILD:  Oh, that thing again.

24                   MR. WILLIAMS:  Get your glasses out.

Page 237

1       BY THE WITNESS:

2            A.   What was the year?

3       BY MR. ROTHSCHILD:

4            Q.   Approximately 2016.

5                 MS. FLOTTE:  Objection, calls for

6       speculation.

7       BY THE WITNESS:

8            A.   We had some hardships, yes.

9       BY MR. ROTHSCHILD:

10           Q.   We had some what?

11           A.   Hardships.

12           Q.   Was the company facing a potential

13      bankruptcy to your knowledge?

14                MS. FLOTTE:  Objection, lack of foundation,

15      calls for speculation.

16      BY THE WITNESS:

17           A.   I don't know what the exact term you would

18      call it, but we did face hardships.  Yes, we did.

19      BY MR. ROTHSCHILD:

20           Q.   Are those hardships behind the company as

21      far as you know?

22           A.   As far as I know.

23           Q.   And the company is profitable as far as you

24      know?

Page 249

1        BY MR. RICHARDSON:

2            Q.   Are you aware of whether ASI cut the hours

3        of any direct employees in 2015?

4                MS. FLOTTE:   Objection, calls for

5        speculation.

6        BY MR. RICHARDSON:

7            Q.   Do you know what I mean by direct employees?

8                MS. FLOTTE:   Objection, calls for

9        speculation.

10               MR. WILLIAMS:   Are you striking your first

11       question?

12               MR. RICHARDSON:   I just want to make sure

13       we're talking about the same people.

14       BY MR. RICHARDSON:

15           Q.   So what do you want to call the people that

16       aren't temporary laborers?

17           A.   Internal employees.

18           Q.   Very good.   That's what I'm talking about,

19       okay?

20               Do you know whether ASI cut the hours of any

21       internal employees in 2014?

22               MS. FLOTTE:   Objection, calls for

23       speculation.

24       BY THE WITNESS:

Page 250

```
 1          A.    Yes.
 2      BY MR. RICHARDSON:
 3          Q.    Did they?
 4          A.    Yes.
 5          Q.    Did they cut your hours?
 6          A.    I'm salaried so yes.  Salaried.
 7          Q.    They gave you a salary reduction?  Okay.
 8          A.    How about --
 9              MR. ROTHSCHILD:  Could you answer audibly?
10              THE WITNESS:  I'm salaried.  I had a salary
11      reduction.
12              MR. ROTHSCHILD:  You didn't answer his
13      question audibly, I'm sorry.
14              MR. WILLIAMS:  She has now.
15              MS. FLOTTE:  It's answered.
16      BY MR. RICHARDSON:
17          Q.    Did your salary ever bump back up to where
18      it was before you took a salary reduction?
19          A.    Not within the same year.
20          Q.    Okay.  So do you know in 2014 anybody else
21      who received a salary reduction?
22              MS. FLOTTE:  Objection as to form;
23      objection, vague.
24      BY THE WITNESS:
```

Page 251

1      A.   We cut hours after that.  Hourly people were

2      cut.

3      BY MR. RICHARDSON:

4           Q.   In 2014?

5           A.   Mm-hmm.

6           Q.   So when say you "cut hours," you mean they

7      just worked less hours?

8           A.   Reduction of hours, yeah.

9           Q.   Okay.  And that was because of the finances

10     of the company?

11               MS. FLOTTE:  Objection, calls for

12     speculation.

13     BY MR. RICHARDSON:

14          Q.   If you know.

15          A.   We had some rough patches, yes.

16          Q.   Did your rough patches get smoother in 2015?

17               MS. FLOTTE:  Objection, vague, calls for

18     speculation.

19     BY THE WITNESS:

20          A.   I can't give you the exact date, but it did

21     get better.

22     BY MR. RICHARDSON:

23          Q.   Okay.  Do you know whether it got better in

24     2015?

Page 252

1              MS. FLOTTE:  Objection, calls for

2       speculation, vague.

3       BY THE WITNESS:

4           A.    I don't know.  I didn't keep track of it.  I

5       just knew what I had to do to make the hours.

6       BY MR. RICHARDSON:

7           Q.    Do you know when your salary was reinstated

8       to what you were being paid before your salary was

9       cut in 2014?

10          A.    Probably the end of '15.

11          Q.    The end of 2015?

12          A.    Mm-hmm.

13          Q.    Do you know when hours that were cut, if

14      they were -- strike that.

15              The people who had hours cut, did they get

16      those hours back at some point?

17          A.    Yes.

18          Q.    Okay.  Do you know when that occurred?

19          A.    I don't remember, but I know we -- they did

20      go back to full-time hours.

21          Q.    Do you know whether it was in 2015?

22              MS. FLOTTE:  Objection, calls for

23      speculation.

24      BY THE WITNESS:

Page 253

```
 1        A.   I would assume so.  I don't remember.
 2   BY MR. RICHARDSON:
 3        Q.   Do you recall whether or not Mr. Swerdloff
 4   didn't pay himself for patches in 2014?  Did -- did
 5   he ever --
 6             MS. FLOTTE:  Objection.
 7   BY MR. RICHARDSON:
 8        Q.   Did he ever talk to you about that?
 9             MS. FLOTTE:  Objection, vague, calls for
10   speculation.
11   BY THE WITNESS:
12        A.   I have no knowledge of his salary.
13   BY MR. RICHARDSON:
14        Q.   Okay.  Did you ever have any discussions
15   with Mr. Swerdloff about the fact that ASI might
16   declare bankruptcy?
17        A.   I was told it was a rough time because we
18   had companies go bankrupt, so it was a rough time.
19        Q.   Do you recall when that was?
20        A.   At the same time my salary got cut and the
21   same time we cut the hours.
22        Q.   Did he ever tell you that the company might
23   go bankrupt?
24             MS. FLOTTE:  Objection, asked and answered.
```