# ATTACHMENT 3

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                   EASTERN DIVISION
 4    BRIAN LUCAS, JOE EAGLE,
      MICHAEL KEYS, ANTWOIN
 5    HUNG and JAMES                  Case No.
      ZOLLICOFFER, on behalf          1:12-cv-09672
 6    of themselves and
      similarly situated
 7    laborers,
                     Plaintiffs,
 8       vs.
      VEE PAK, INC., STAFFING
 9    NETWORK HOLDINGS LLC,
      PERSONNEL STAFFING
10    GROUP, LLC d/b/a MOST
      VALUABLE PERSONNEL,
11    d/b/a MVP and
      ALTERNATIVE STAFFING,
12    INC., d/b/a ASI,
                     Defendants.
13    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
14                VIDEO DEPOSITION OF
15                 STEVEN SWERDLOFF
16
17
18                 March 8, 2018
19                   9:12 a.m.
20
21        444 West Lake Street, Suite 3200
22               Chicago, Illinois
23            Veritext Legal Solutions
                 Mid-Atlantic Region
              1250 Eye Street NW - Suite 350
24              Washington, D.C.  20005
```

                                                    Page 2

1                    APPEARANCES OF COUNSEL
2    On Behalf of the Plaintiffs, BRIAN LUCAS, JOE
     EAGLE, MICHAEL KEYS, ANTWOIN HUNG and JAMES
3    ZOLLICOFFER, et al.:
4             COHEN MILSTEIN SELLERS & TOLL
              MR. JOSEPH M. SELLERS
5             MS. MIRIAM NEMETH
              1100 New York Avenue NW
6             Fifth Floor
              Washington, DC 20005
7             (202) 408-4600
              jsellers@cohenmilstein.com
8             mnemeth@cohenmilstein.com
                   - and -
9             WORKERS LAW OFFICE
              MR. CHRISTOPHER J. WILLIAMS
10            53 West Jackson Boulevard
              Suite 701
11            Chicago, Illinois 60604
              (312) 795-9121
12            cwilliams@wagetheftlaw.com
13   On Behalf of the Defendant, PERSONAL STAFFING GROUP
     LLC d/b/a MVP and STAFFING NETWORK:
14
              KOREY RICHARDSON
15            MR. ELLIOT RICHARDSON
              MS. MICHELE D. DOUGHERTY
16            20 South Clark Street
              Suite 500
17            Chicago, Illinois 60603
              (312) 372-7075
18            erichardson@koreyrichardsonlaw.com
              mdougherty@koreyrihcardsonlaw.com
19
     On Behalf of the Defendant, Alternative Staffing,
20   Inc.:
21            MICHAEL BEST
              MR. BRIAN P. PAUL
22            444 West Lake Street
              Suite 3200
23            Chicago, Illinois 60606
              (312) 527-6843
24            bppaul@michaelbest.com

```
                                              Page 3
 1              APPEARANCES OF COUNSEL:  (Continued)
 2    On Behalf of the Defendant, VEE PAK, INC.:
 3            GOLDSTINE, SKRODZKI, RUSSIAN, NEMEC and
              HOFF
 4            MR. DONALD S. ROTHSCHILD
              835 McClintock Drive
 5            Second Floor
              Burr Ridge, Illinois 60527-0860
 6            (630) 655-6000
              drothschild@gsrnh.com
 7                 - and -
              VEDDER PRICE
 8            MR. EDWARD C. JEPSON, JR.
              222 North LaSalle Street
 9            Chicago, Illinois 60601
              (312) 609-7500
10            ejepson@vedderprice.com
11    ALSO PRESENT:
              Barbara Rudolf, Videographer
12            Thomas A. Zwartz, Vee Pak, President
13                    *   *   *   *   *
14
15
16
17
18
19
20
21
22
23
24
```

```
1                    I N D E X

2  WITNESS                    EXAMINATION

3  STEVEN SWERDLOFF

4     EXAMINATION BY MR. SELLERS           10

5     EXAMINATION BY MR. ROTHSCHILD        134

6     EXAMINATION BY MR. RICHARDSON        219

7                    EXHIBITS

8    NUMBER           DESCRIPTION          PAGE

9   Exhibit 1        Plaintiffs' Notice of    12

10                   Deposition of Steven

11                   Swerdloff

12  Exhibit 2        Excerpt of "Class Action   13

13                   Partial Settlement

14                   Agreement With

15                   Alternative Staffing,

16                   Inc. Only"

17  Exhibit 3        Staffing Agreement;      31

18                   ASI 000120-124

19

20

21

22

23

24
```

Page 5

1                        EXHIBITS

2    NUMBER              DESCRIPTION              PAGE

3      Exhibit 4        3.11.2005 Letter From        33

4                       Labor Temps South, Inc.,

5                       to Michael Vennetti;

6                       ASI 000125

7      Exhibit 5        Alternative Staffing,        48

8                       Inc., Employment

9                       Application;

10                      ASI 000073-97

11     Exhibit 6        ASI Application Process;     65

12                      ASI 000098-99

13     Exhibit 7        ASI TempWorks Best           69

14                      Practices - Dispatcher

15                      Role/Recruiter Role;

16                      ASI 000104-116

17     Exhibit 8        Employee Entry Screen        76

18                      Shot; ASI 000119

19     Exhibit 9        12.05.08 to 10.09.11         84

20                      (Temp-2nd Shift)

21                      ASI-Vee Pak List Printed

22                      01.04.2018;

23                      ASI 000126-137

24

1                    EXHIBITS

2    NUMBER              DESCRIPTION              PAGE

3      Exhibit 10      ASI Employee List by          86

4                      Customer; ASI 000297-306

5      Exhibit 11      (CONFIDENTIAL PURSUANT TO     89

6                      PROTECTIVE ORDER)

7                      1.1.2018 to 2.6.2018 ASI

8                      Employee List by

9                      Customer; ASI 000540-542

10     Exhibit 12      (CONFIDENTIAL PURSUANT TO     97

11                     THE PROTECTIVE ORDER)

12                     Excerpt of EEO-1;

13                     ASI 000543-552

14     Exhibit 13      12.5.2009 to 1.16.2018        98

15                     ASI Do Not Assign by

16                     Customer; ASI 000147-157

17     Exhibit 14      Temp Labor Service           100

18                     Provider - Do Not Return

19                     Approval Request;

20                     ASI 000200-201

21

22

23

24

Page 7

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | 1.4.2016 Do Not Return Approval Request for Sheila Morrison; ASI 000220 | 104 |
| Exhibit 16 | 8.29.2015 Do Not Return Request for Dajanae Watts; ASI 000238 | 106 |
| Exhibit 17 | 4.9.2015 E-mail; ASI 000539 | 126 |
| Exhibit 19 | Settlement Agreement Excerpt | 137 |
| Exhibit 20 | Declaration of Steven Swerdloff | 139 |
| Exhibit 21 | Declaration of Kyle Carstensen | 149 |
| | CERTIFIED QUESTION | 240 |
| | CERTIFIED QUESTION | 244 |
| | CERTIFIED QUESTION | 243 |

```
                                              Page 38

 1      A.    I'm sorry.  Where are you reading?

 2      Q.    2(c).

 3      A.    Okay.

 4      Q.    Do you see that?

 5      A.    Yes.

 6      Q.    Is that a fair description of what ASI has

 7   provided to Vee Pak?

 8      A.    Yes.

 9      Q.    If you look at 2(a), couple paragraphs up,

10   would you read that paragraph to yourself.

11      A.    Okay.

12      Q.    What do you understand paragraph 2(a) to

13   obligate ASI to do with respect to Vee Pak?

14      A.    It means that when we are sent an e-mail

15   of their needs for a particular shift, that we will

16   make our best effort to satisfy that -- those

17   needs.

18      Q.    Okay.  Do you understand from this

19   agreement whether -- who -- as between ASI and

20   Vee Pak, who is in charge of determining what

21   characteristics of what people to send to Vee Pak?

22      A.    I need you to be more specific, sir.

23      Q.    So what I'm asking you is -- let me say it

24   this way:  Does -- has Vee Pak at one time or
```

1   another advised -- told ASI that it wants laborers

2   sent to it with certain characteristics, either

3   certain skill sets or experience or other

4   characteristics?

5       A.   Yes.

6       Q.   And when Vee Pak has specified that it

7   wants those particular characteristics, do you

8   understand the agreement to obligate ASI to comply

9   with that request to the best of its ability?

10      A.   Yes.

11      Q.   Under the agreement -- again, let's talk

12  about the agreement in 2015 for the moment.

13      A.   Okay.

14      Q.   Does -- has Vee Pak had the authority or

15  the ability to reject laborers who ASI refers to it

16  for work?

17      A.   Yes.

18      Q.   And if they are rejected -- has that ever

19  happened?

20      A.   Yes.

21      Q.   And if those laborers are rejected after

22  they've been referred to Vee Pak for work, is --

23  what has ASI done about that?  Do you send other

24  workers?  Do you attempt to send the same workers

Page 40

1    again, or do you attempt to do something different?

2          A.    I think you may have to ask the question a

3    different way.

4          Q.    Okay.  I'll come back to it.

5                Have you understood that even before 2015

6    that ASI had an obligation with respect to its work

7    with Vee Pak to refer laborers that met the

8    particular requested needs of Vee Pak?

9          A.    Yes.

10         Q.    And so while the letter agreements that

11   are Exhibit 4 -- well, let me ask you, does that

12   term appear in Exhibit 4?

13         A.    No.

14         Q.    Did you nonetheless understand that you

15   had that obligation to ASI or before that

16   Labor Temp South had that obligation with Vee Pak?

17         A.    Yes.

18         MR. ROTHSCHILD:  Can we just be clear the term

19   you are referring to is "specifications"?

20         MR. SELLERS:  I'll ask the question again.

21         MR. ROTHSCHILD:  I just wasn't clear myself.

22   He knew it.  I didn't.

23   BY MR. SELLERS:

24         Q.    Fair enough.

1          My question is you refer to -- in

2     Exhibit 3, the more detailed agreement, is it your

3     understanding pursuant to that agreement, that ASI

4     had an obligation to refer laborers to Vee Pak that

5     met the particular requested or demanded

6     characteristics of those laborers?

7          A.   Correct.

8          Q.   And my question to you was, first, did

9     that term appear in Exhibit 4, and I think your

10    answer was it does not?

11         A.   It does not.

12         Q.   And my next question was do you

13    understand -- did you understand at the time that

14    your obligation, that is ASI's obligation to

15    Vee Pak in the years prior to 2015, was the same as

16    it is set forth in Exhibit 3, meeting the needs of

17    the -- specified needs for the laborers?

18         A.   Yes.

19         Q.   So let me direct your attention to

20    Exhibit 3 again, the detailed agreement, the next

21    page, and it's two-sided.  It's page No. 2 of 5 at

22    the bottom, and in particular there is a section

23    called "Customer Agrees."  Do you see that?

24         A.   Uh-huh.

Page 42

1      Q.    Okay.

2      A.    Yes.

3      Q.    And then there are a series of

4  subparagraphs.  I'm going to ask you to focus on

5  and read to yourself paragraph 3(b) as in boy.

6      A.    Okay.

7      Q.    So this paragraph -- what did you

8  understand this paragraph would obligate Vee Pak to

9  do?

10     A.    There are times that we, in the recruiting

11  effort, do not feel that a candidate or an employee

12  or a prospective employee would do the job --

13  perhaps it's the way they interviewed; perhaps it's

14  the way they answered questions during their

15  intake -- and at that same time an account orders a

16  large incremental amount of people.  And in

17  reviewing the candidates, we don't believe we can

18  fill that order because we feel that they, the

19  employees, would not be able to do the job.  Thus,

20  if we felt that way, we would not fill the entire

21  order.

22     MR. PAUL:  Just for clarification, because

23  I can see Mr. Swerdloff's finger on what he read,

24  he's referring to paragraph 3(d) as in dog.

1      MR. SELLERS:  Thank you for pointing that out.

2  BY MR. SELLERS:

3      Q.  I want to focus your attention and let's

4  ask you to read it out loud so we are pointing to

5  the same paragraph.

6      A.  Are we talking (d)?

7      Q.  No.  Sorry.  I said 3(b) as in boy.

8      A.  I'm sorry.

9      Q.  That's all right.  Fair enough.

10         So why don't you read 3(b) out loud?

11     MR. RICHARDSON:  I need for you to take a break

12  when you're at a breaking point.

13  BY MR. SELLERS:

14     Q.  Why don't you read it out loud so we're

15  clear on what you're reading.

16     A.  "Customer, at its election, will provide

17  sufficient information about its specific job

18  requirements and qualifications so that ASI can

19  match the skills and experience of its personnel to

20  meet such needs."

21     Q.  So that's the -- and if you want to take a

22  moment to read it to yourself, that's the paragraph

23  I want to ask you a question about, so you

24  understand it.

Page 44

1      A.    That's fair.

2      Q.    So what do you understand that paragraph

3   to obligate Vee Pak to do?

4      A.    Vee Pak says they want a machine operator,

5   they want a forklift driver, they want a CNC

6   mechanic, we then have to access our database and

7   find -- or log in to a particular skill set and

8   find available candidates with that skill set, and

9   then after they have been interviewed, send them

10  out to Vee Pak.

11     Q.    All right.  But your understanding of what

12  this obligates Vee Pak to do, is it to communicate

13  to ASI what particular information or requirements

14  they want for the particular candidate?

15     A.    It depends upon the position.

16          If Vee Pak indicates they want a stand-up

17  forklift driver, it's self-explanatory.  If Vee Pak

18  says they want someone in compounding, it's

19  self-explanatory.  Something with more specificity

20  would be we have to have a -- somewhat of a job

21  description to be able to handle it, but that's

22  getting more into the higher skilled area.

23     Q.    Okay.  And if Vee Pak said, "We want a

24  packer," or another job like that, would that be

Page 45

1    something that required special skills?

2        A.    No.

3        Q.    And would you expect Vee Pak to spell out

4    anything more than just "We need three packers,"

5    for instance?

6        A.    No.

7        MR. SELLERS:  Why don't we take a break.

8        THE VIDEOGRAPHER:  We are going off the video

9    record at 10:02 a.m., and this is the end of

10   Video Media 1.

11                        (A short break was taken.)

12       THE VIDEOGRAPHER:  We are back on video record

13   at 10:14 a.m., and this is the beginning of

14   Video Media 2.

15   BY MR. SELLERS:

16       Q.    Mr. Swerdloff, I want to ask you a little

17   bit about the nature of the jobs that ASI was

18   referring to fill at Vee Pak.  Can you give us a

19   sense of the types of jobs that were typically

20   filled at Vee Pak?

21       A.    The preponderance of work was general

22   labor, people that worked on various lines, torqued

23   caps, just worked on various different assembly

24   lines of different bottled products.

Page 46

1      Q.   And were those jobs that you described

2    ones that required any special learning or training

3    before the candidate was referred there?

4      A.   No.

5      Q.   I want to ask you a little bit about the

6    process you went about in the Cicero office with

7    leading up to referring people out to Vee Pak.  So

8    let's start with if I came to the Cicero office

9    looking for work, what would happen?  What's the

10   first thing that would happen to me?  Would I sign

11   in somewhere?

12     A.   You would -- there would be an individual

13   there to provide you with an application.  That

14   individual would assist you, if you didn't know how

15   to fill out everything that was on the application.

16   After the application was filled out, you would go

17   into an intake room.  The intake room enters the

18   name, social security number and provides the

19   applicant an ID number; whereas later in the day

20   after all the applications are taken, the balance

21   of the application is entered in.

22         Then the individuals go through the

23   verification process where all respective

24   information regarding their eligibility for work is

Page 47

1  codified and entered into an electronic I-9

2  verification system.

3      Q.   All right.  So I know there is more to it,

4  but let's stop there and probe that a little bit.

5      A.   Okay.

6      Q.   So when I walk in the door at the Cicero

7  office, the first thing I'm handed is an

8  application, or is there any kind of sign-in where

9  I would sign in to give my name?

10      MR. ROTHSCHILD:  Let me just register an

11  objection as to foundation.  I'm not sure what the

12  time frame that you're talking about.

13      MR. SELLERS:  Fair enough.

14  BY MR. SELLERS:

15      Q.   Let's talk about the present.

16      A.   There is an individual -- there are two

17  people in the intake.  One individual takes their

18  names and the other individual does the entry --

19  prior individual.  The former individual helps the

20  individual -- the applicant fill out the

21  application.

22          Then they are called by name in the order

23  that they came into the office to go into the

24  intake room to provide all of the I-9 -- go through

Page 48

1   the I-9 process.

2       Q.   And the "I-9 process" is the process you

3   were referring to as to determine whether they are

4   eligible to work in this country?

5       A.   It is taking the appropriate documents,

6   entering them into the electronic system so they

7   are permanently stored.  The documents are then

8   handed back to the applicant.  The entire I-9 is

9   filled out and signed.

10      Q.   And is that process used, as just

11  described, one they use with respect to all your

12  customers or just with respect to people who might

13  be referred to Vee Pak?

14      A.   All customers.

15                  (Whereupon, SWERDLOFF Exhibit 5

16                  was marked for identification.)

17  BY MR. SELLERS:

18      Q.   You've been handed Exhibit 5.  Do you

19  recognize this document?

20      A.   Yes.

21      Q.   And I think -- just to call to your

22  attention, I think there is copying on both sides,

23  at least on some pages.

24          Do you recognize it?

1      A.    Yes.

2      Q.    And what do you recognize it to be?

3      A.    ASI's employment application.

4      Q.    Okay.  Is this the application that you

5   were just referring to that is provided to laborers

6   who come into the office in Cicero?

7      A.    Yes, it is.

8      Q.    How long have you been using this

9   particular application?

10      A.    The application is an ongoing -- requires

11   ongoing modification.  The basic format has been

12   used for a good number of years.  However, the

13   contents are changed every three to six months

14   depending upon regulations, et cetera.

15      Q.    All right.  So let me go through some

16   portions of this and ask you how long they have

17   been used to the extent you know.

18      A.    Okay.

19      Q.    So I assume you have consistently asked

20   for name, address, phone numbers.  That hasn't

21   changed?

22      A.    Correct.

23      Q.    What are the -- why ask for the phone

24   numbers of people?

Page 50

1      A.   So we can call them and ask them if they

2  want to go to work.

3      Q.   All right.  So after their names are put

4  into the system, if you need to reach people to

5  refer them out for work, you call them?

6      A.   Correct.

7      Q.   Okay.  So people don't have to come back

8  to the office to be referred out after they've come

9  the first time; is that correct?

10     A.   No.

11     Q.   Not correct?

12     A.   It's not correct.

13     Q.   Can you correct me?

14     A.   Sure.

15          The first time they go off on assignment,

16 they must show up at the office because they are an

17 unproven entity.  After they've been working a few

18 days and we believe they will continuously show up,

19 then they can confirm their assignment over the

20 phone --

21     Q.   I see.

22     A.   -- and not report to the office.

23     Q.   Okay.  Let's continue in the application.

24          It asks for whether people have a

1    geographic area of preference by miles or minutes.

2    What's the purpose of that?

3         A.   You certainly don't want to assign a

4    person from the South Side to a job on the

5    North Side.  So it's a matter of how far can they

6    drive, can they drive, do they have a car, how long

7    can they commute.  That has to be taken into

8    consideration.  Some people take public

9    transportation.  Some factories don't have

10   availability to public transportation.  That all

11   has to be taken into the dispatch scenario.

12        Q.   And so it's up to the laborer to get him

13   or herself to the customer's office?

14        A.   Correct.

15        Q.   Okay.

16        A.   There is an exception to that.  We do have

17   vans, and in some instances we do take people to a

18   particular site.

19        Q.   And under what circumstances do you do

20   that?

21        A.   We typically have a van available for most

22   larger accounts for some individuals that either

23   lost their car; the car was repossessed; they are a

24   good worker; the account wants them back.  So there

Page 52

1  is a judgment call there, and that's transportation

2  that's provided free.

3     Q.   Okay.  Did you provide van service for

4  laborers referred to Vee Pak?

5     A.   We have.

6     Q.   Has that been done consistently throughout

7  your contract?

8     A.   Yes.

9        But it is dependent on the amount that

10  they would order.  Their core business is

11  probably -- well, it's 85 percent of their order.

12  When they are a core, most of those people get to

13  work on their own.  When they go flex, then we

14  usually take some additional flex people.

15     Q.   So I'm sorry.  You are going to have to --

16  I understand the difference between core and flex.

17  But what I understand from your testimony is that

18  if the order for Vee Pak is for core workers, they

19  would be obliged to get to the place of work

20  themselves?

21     A.   The majority of them get to the work

22  themselves, yes.

23     Q.   And the flex jobs, which are more in the

24  nature of the temporary need-type job, might be

Page 53

1    ones that would be ones in which people might be

2    transported by van?

3        A.   Correct.

4        Q.   Are there occasions -- when are -- I'll

5    come back to that.

6             Then you have a section here on education,

7    and I think you already stated that most of the

8    jobs that you filled for Vee Pak did not require

9    any special education; is that right?

10       A.   Correct.

11       Q.   You have a section for previous

12   employment.  What do you do with that information?

13       A.   We do one of two things:  No. 1, we do a

14   job verification if it is a higher skilled

15   position; No. 2, if it were through a temp agency,

16   we utilize it as potential leads for new business.

17       Q.   You -- in the second page of Exhibit 5,

18   which I think is on the back, you asked about

19   military service.  What do you do with that

20   information?

21       A.   Well, I try to prioritize their

22   assignment.

23       Q.   And then on the next page you have a

24   checklist for various skills that you, I assume,

1    leave that to the laborer to identify skills he or

2    she claims to have?

3         A.    That's the skills match we referred to

4    earlier.  Correct.

5         Q.    Okay.  And, again, just to be clear, as

6    I understand it, most of the jobs you fill at

7    Vee Pak had no special prior skill set required;

8    correct?

9         A.    Correct.

10        Q.    There is a section beginning "Alternative

11   Staffing Employment Policies," and in the left

12   bottom corner it bears the number beginning

13   ASI 00079.  The title, though, is "Alternative

14   Staffing Employment Policies" on the top.  Do you

15   see it?

16        A.    (Witness nodding head.)

17        Q.    When did that first come into use?

18        A.    I have no idea what 179 is at the bottom.

19        Q.    I can tell you what that is.

20              The lawyers, in order to make sure we keep

21   track of all the documents, stamp the documents

22   numerically.  So that is just a lawyer number so

23   that we can keep track of -- we all know what this

24   document is.  It has nothing to do with you, but

Page 107

1    A.    Correct.

2    Q.    That's Mr. Zwartz's initials?

3    A.    I believe so.

4    Q.    Mr. Swerdloff, did there ever come a point

5  you understood people at -- somebody at Vee Pak

6  expressed a view that they did not want

7  African-American workers referred to the company?

8    A.    Yes.

9    Q.    When did you first come to believe that

10  was occurring?

11    MR. ROTHSCHILD:  Object to the form of the

12  question.

13    THE WITNESS:  In 1998 when we started doing

14  business with Vee Pak, I made a number of tours at

15  the Vee Pak facility with Mike Vennetti, shift

16  managers, et cetera, and it was apparent that all

17  of the individuals that were there were Hispanic.

18    Later on I had a few conversations over the

19  period of time back then with both Juan and Mario.

20    Juan was a tad more colorful than Mario.  But

21  Juan basically stated that he wanted young,

22  good-looking Hispanic females, and that if we could

23  not provide those to him, he would take our orders

24  and give them to another agency.

1     Mario, on the other end, was not as colorful.

2  He basically stated that he wanted Hispanic

3  individuals because the African-Americans never

4  stayed.  He wound up having to retrain them and --

5  period.

6  BY MR. SELLERS:

7     Q.   Have you finished your answer?

8     A.   I finished my answer.

9     Q.   So let me go back to 1998 when you were

10  first starting business, and you made an

11  observation, as I think you said, toward the

12  company that it appeared to you their workers there

13  were Hispanic.

14        What led you to observe that?  How did you

15  determine that?

16     A.   I walked into a factory, saw over 200 and

17  some-odd people, and I never saw one

18  African-American.

19     Q.   Okay.  Did you happen to overhear the

20  language people were speaking?

21     A.   They were all speaking Spanish.

22     Q.   Then you referred to a Juan and Mario.  Do

23  you know their last names?

24     A.   I think it's Juan Montoya, I think -- I'm

Page 109

1   not sure -- but I think it's Juan Montoya, and

2   I don't know Mario's last name.

3       Q.   So when did you first have a conversation

4   with Mr. Montoya roughly?

5       A.   Well, back in -- I had one or two

6   conversations with Juan when we first were hired by

7   Vee Pak in the early stages of our relationship so

8   I could get the tempo or the feel of the business

9   back in the 1998-'99 area.

10          I had also spoken to him in 2009, '10,

11  '11.  I recall one or two conversations with him as

12  well as Mario.

13          Julie took on most of the daily activity,

14  and back then my wife drove a van, and so did

15  Julie, in getting the people there.

16      Q.   Okay.  Do you know what Mr. Montoya's

17  position was at Vee Pak?

18      A.   I believe he was the first shift manager.

19  I think.  Sometimes I get them mixed up.  I believe

20  Juan was first and Mario was second.

21      Q.   But they were both shift managers?

22      A.   Yes.

23      Q.   Just so I understand your understanding,

24  what was their responsibility?  Were they shift

Page 110

1   manager in charge of all the workers on that shift?

2       A.   They were the boss.  They are the ones

3   that made your life or killed you.

4       Q.   So you had -- initially had conversations

5   with Mr. Montoya in person?

6       A.   Yes, when I was on the floor.

7       Q.   Okay.  This was early in your relationship

8   with Vee Pak; is that right?

9       A.   Correct.

10      Q.   Okay.  Then I gather you had at least one

11  conversation or more with Mr. Montoya in which he

12  referred to his -- that they wanted were

13  good-looking Hispanic females.  Was that over the

14  phone, or was that in person?

15      A.   That one, I believe, was over the phone,

16  yes.

17      Q.   And, roughly, what year was that?

18      A.   I can't remember back that far.  I can

19  remember it may be in the '09-'10 arena.  I can

20  remember when I was on the floor in '98-'99.  That

21  I remember.

22      Q.   All right.  So your best recollection is

23  the conversation you're referring to about

24  Mr. Montoya saying he wanted younger-looking,

```
                                            Page 111
```

1  Hispanic females was around 2009 or 2010?

2      A.   Yes.

3      Q.   And what did you say in response?

4      A.   Nothing.

5      Q.   Did the conversation end after he said

6  that?

7      A.   No.  It was nice.  I was a very young

8  company.  I was new in the business.  And the

9  culture was what it was, and I adhered to it.

10     Q.   That's what I was going to ask you.  Did

11 you follow his direction?

12     A.   Yes.

13     Q.   Why did you do that?

14     A.   Because I was afraid of losing his

15 business.

16     Q.   And how did you go about implementing

17 Mr. Montoya's demand to have young, good-looking

18 Hispanic females?

19     A.   Well, and I'm not sure we ever satisfied

20 the colorful part of the remark.  But my

21 conversations with our head dispatcher, who is

22 still there today -- she's been with us 13 years --

23 DeeDee, she went down for an on-site visit.

24 I might have even taken her.  I'm not sure.  She

Page 112

1    would sometimes even drive, in the morning, people

2    to work.  As a matter of fact, she did drive for

3    quite a period of time.  Maybe as long as a year on

4    and off, not regularly.

5           And being Hispanic herself, she could read

6    the blueprint pretty well, and Juan would tell her

7    the types of people he wanted.  And he would talk

8    to her, and she did what she had to do.  She let me

9    know that she was doing it, and I said, "Do what

10   they ask you to do."

11          There were times that DeeDee was extremely

12   frustrated because Juan would call up and ask to

13   fill extra orders, but she couldn't fill it because

14   the only individuals she had were

15   African-Americans.  And she'd know they would bump

16   them out, and it was what it was.  We just had to

17   live with it.

18      Q.   You mentioned that Mr. Montoya used what

19   you described as "colorful language."  And

20   I apologize to ask you to have it repeat it, but

21   I think we have to have it for the record.  Can you

22   report what he used?

23      MR. ROTHSCHILD:  Objection.  Foundation.

24   Because I'm not sure which conversation and when.

Page 113

1   BY MR. SELLERS:

2        Q.   Well, I'll ask you:  You said before that

3   at some point Mr. Montoya used colorful language in

4   connection with saying he wanted young,

5   good-looking Hispanic females.  Is that the

6   characterization of your testimony?

7        A.   That is accurate.

8        Q.   And was that in reference to the

9   conversation around 2009 or 2010?

10       A.   It was.

11       Q.   All right.  And, again, with my apologies,

12  I ask you to repeat what he said.

13       A.   I'm not sure I want to repeat it.  There

14  are ladies in the room, and I don't think it's

15  really appropriate.  I don't feel good really

16  saying it.

17       MR. PAUL:  Steven, this is a deposition, and

18  everybody in the room is adults.

19       MR. SELLERS:  We are all professionals.

20       MR. PAUL:  And you should testify honestly to

21  what was said and answer questions.  Okay?

22       THE WITNESS:  He said he wanted good looking

23  young ladies with big tits.

24

Page 114

1    BY MR. SELLERS:

2        Q.   And this is a conversation where you had

3    nothing to say in response?

4        A.   He -- no.

5        Q.   Were you -- how did you --

6        A.   I didn't even respond to it.

7        Q.   Were you expecting a statement like that

8    from Mr. Montoya?

9        A.   I wasn't expecting a statement like that,

10   and I wasn't expecting him to hit on my dispatcher

11   either, but it all happened.

12       Q.   Your dispatcher is DeeDee?

13       A.   Yes.

14       Q.   What is Dee Dee's last name?

15       A.   Gonzalez.

16            Her actual name is Deyanira.

17       Q.   I'll call her Ms. Gonzalez.

18            When did you understand Mr. Montoya, as

19   you put it, hit on Ms. Gonzalez?

20       A.   When DeeDee drove people down there in the

21   van one day and she walked the floor with Juan, and

22   Juan was talking about taking -- wanted to take her

23   out or take her here or take her there.  For more

24   specificity, you need to ask DeeDee.

Page 115

1      Q.   Do you remember roughly when that
2    occurred?
3      A.   No, I don't.  I just know it occurred.
4      Q.   Why do you know it occurred?
5      A.   Because DeeDee told me.
6      Q.   And did she report this happening on more
7    than one occasion or just once?
8      A.   Just once.
9      Q.   So how often did your -- I'm sorry --
10   DeeDee was one of the dispatchers?
11     A.   Yeah.  She -- yeah.  She's been there
12   about 12, 13 years.
13     Q.   But the role she was performing then was
14   as a dispatcher?
15     A.   She was the dispatcher, but she was my
16   eyes, my ears, my driver.  When you are small, you
17   are small, and you sort of, like, do everything.
18     Q.   Right.  Okay.
19          And one of the roles she played was she
20   would drive workers over to Vee Pak when they
21   needed to?
22     A.   Yes.
23     Q.   Does Ms. Gonzalez still work at ASI?
24     A.   Yes.

Page 116

1    Q.   Other than this one conversation you said

2  around 2009 or 2010 with Mr. Montoya -- and I won't

3  repeat the language that he used with you, but you

4  testified about it -- were there any other

5  occasions when you spoke to Mr. Montoya about

6  his -- a preference with respect to Hispanics or

7  Hispanic women?

8    A.   Not that I recall.

9    Q.   Let me turn to Mario.

10        Roughly when did you have a conversation

11 with -- one or more conversations with Mario?

12   A.   I believe I only had potentially one

13 additional conversation with Mario, and as

14 I stated, I think earlier, he was not of the

15 colorful type.  He's a pretty straight and narrow

16 type of guy.  I think then his mother was working

17 there or wife -- whatever -- anyway, I'm getting

18 off track.

19        He was just simply stating that

20 African-Americans didn't work out well, and he

21 didn't want them.

22   Q.   And did you -- what did you understand

23 from that?

24   A.   That he didn't want African-Americans.

Page 117

1      Q.   And did that lead you to do anything with
2  respect to the types of candidates you referred to
3  Vee Pak?
4      A.   I continued the same practice.
5      Q.   So Mr. Montoya made this demand before you
6  spoke to Mario?
7      A.   No.  It was close -- in the '9 to '11 time
8  period.  I spoke to both of them that period.
9  I don't remember who came first, but it was in the
10  same time period.
11      Q.   And since we are clear, we say '9 to '11,
12  you mean 2009 to 2011?
13      A.   Yes.
14      Q.   Okay.  All right.  You mentioned also
15  Ms. Tracey took people over to Vee Pak from time to
16  time?
17      A.   Yes.
18      Q.   Do you know whether either of these men
19  spoke to Ms. Tracey about these same preferences?
20      A.   I don't know.
21      Q.   Okay.  Are you aware of whether
22  Mr. Montoya or Mario spoke to either -- anyone else
23  at ASI about any demands for -- either referring
24  African-Americans -- or referring Hispanics or not

Page 118

1   referring African-Americans?

2        A.    In my guesstimation or best understanding,

3   they would speak, Juan and Mario, would speak to

4   our dispatchers a minimum of twice a day.  What was

5   said on a daily basis, I'm not quite sure.

6        Q.    I assume if we -- the person to talk to

7   would be the dispatcher about that?

8        A.    Oh, yes.

9        MR. ROTHSCHILD:  I'll object to the form of the

10  question.  "About that."

11  BY MR. SELLERS:

12       Q.    And which dispatcher would you suggest we

13  speak to about conversations they had with

14  Mr. Montoya or with Mario?

15       A.    Deyanira, DeeDee, Ms. Gonzalez.

16       Q.    Anyone else you can think of?

17       A.    They weren't there for -- we have turnover

18  on second shift.

19       Q.    And Ms. Gonzalez worked the second shift?

20       A.    No.  She worked first shift.

21       Q.    First shift.  Okay.

22             Did there come a point when you spoke to

23  Mr. Zwartz about this?

24       A.    Yes.

```
                                           Page 119

  1       Q.    When did that happen?

  2       A.    Sometime after the lawsuit.  I don't

  3   recall when.

  4       Q.    Okay.  And how did that come about?  Did

  5   you call him?  Did he call you?

  6       A.    I'm not sure who made the call.  One of us

  7   did, obviously.  We did meet in his office.  I was

  8   extremely concerned over the lawsuit, very

  9   concerned about the lawsuit.  And we sat down, and

 10   we discussed our performance and relationship.  He

 11   had a matrix, that how many days were we short,

 12   over, et cetera.  We also talked about future

 13   production plans and what they're looking at doing

 14   and increasing lines or decreasing lines,

 15   et cetera.

 16           And we talked briefly about the lawsuit.

 17   He did not want to talk about the lawsuit.  He said

 18   he was told not to talk about the lawsuit.

 19           I told -- I spoke to him that I was very

 20   concerned about the practices that we had.  He

 21   reiterated more than once that he didn't feel

 22   comfortable about it.  He sort of concurred with my

 23   thought process, and basically said we will not

 24   discuss lawsuits because either his management or
```

Page 120

1  somebody said do not discuss this at all.

2        And but I think we both understood what we

3  didn't say to each other.

4     Q.   When you said that you recall Mr. Zwartz

5  saying "didn't feel comfortable about it," was it

6  he didn't feel comfortable about talking about the

7  lawsuit, or it's your understanding he said he

8  didn't feel comfortable about the practices that

9  were alleged in the lawsuit?

10    A.   It was my opinion he didn't feel

11 comfortable talking about the lawsuit with me.

12    Q.   Did you at any point raise with Mr. Zwartz

13 whether Mr. Montoya or Mario had the authority to

14 do the things they were doing with respect to

15 Hispanic and African-American workers?

16    A.   No.

17    Q.   Do you know whether Mr. Montoya is still

18 working at Vee Pak?

19    A.   I don't know.

20    Q.   Do you know whether Mario is still working

21 at Vee Pak?

22    A.   I think he is, but I don't know.  I don't

23 handle the account on a day-to-day basis.

24    Q.   Okay.  Are you -- were you ever informed

Page 121

1    of an incident that may have occurred in which a

2    group of African-American workers who were being

3    driven over to Vee Pak were turned away?

4         A.   Yes.

5         Q.   What do you recall about that?

6         A.   We had a -- our on-site manager Carmen was

7    at the account.  There was a -- there was a late

8    call called in by Vee Pak for ten additional

9    people, approximately ten.  It was a late call,

10   and, anyway, the majority of them were non-Hispanic

11   and African-American.

12        The people arrived -- and I don't know if

13   DeeDee took them.  I don't know who took them.

14   I don't know who the driver was -- and an

15   individual by the name of Joe looked at them and

16   said, "Get their fucking black ass out of here."

17        Q.   Okay.  How did you come to hear about

18   that?

19        A.   I'm not sure if I heard it from Carmen or

20   Kyle.

21        Q.   And so just so I understand some of the

22   terminology you used.  You talked about a late

23   call.  Is this a request for workers that came

24   outside of the regular shift time period?

Page 122

1      A.   It was, basically, a screw-up.  They had

2   either an additional line that had to get up or

3   another way you can say shorted them, and so we

4   were called to sort of, like, backfill an order.

5   All right?  So we were probably an hour late than

6   over the regular shift time.  So if it was at 7:00,

7   we probably got there 8:00, 8:15, something like

8   that.

9      Q.   And I assume you were trying to meet an

10  unexpected demand to Vee Pak for labor?

11      MR. RICHARDSON:  Object to the form.

12  BY MR. SELLERS:

13      Q.   You may have answered this, but who

14  reported back to you what language was attributed

15  to this man Joe?

16      A.   Once again, I believe it was Carmen.

17  I know she was fairly hysterical over it.  After

18  that I basically put a call in to Tom, sort of like

19  a 911 call.  I believe there might have been

20  somebody else on the call along with Tom, but

21  I can't remember who.  I told him what happened.

22  He said he would investigate and get back to me.

23          He did get back to me in short order, and

24  I heard -- I'm not sure from who -- that Joe was

```
                                               Page 123
 1   fired.
 2       Q.   Okay.  Do you know roughly what year or
 3   era this occurred?
 4       A.   This had to be somewhere around '14,
 5   September of '14, somewhere around there.
 6       Q.   And I assume that -- do you know whether
 7   the African-American workers that were -- to whom
 8   these -- this phrase was made, were they allowed in
 9   to work that day?
10       A.   Absolutely not.
11       Q.   Were they otherwise eligible to work?
12       A.   Yes.
13       Q.   Did there come a point when there was an
14   increase of demand for workers sent to Vee Pak from
15   ASI that you couldn't fill without including some
16   African-Americans?
17       A.   There -- yes.
18       Q.   Roughly when did that start?
19       A.   Shortly after the lawsuit.  I don't recall
20   exactly when.
21       Q.   And when this uptick in work demand or
22   demand for extra workers at Vee Pak occurred, what
23   did you do about that?  Were you still able to fill
24   it with workers that Vee Pak manages and asked for?
```

Page 124

1          A.    At this juncture, they had a major

2     cultural problem going on, in my opinion.  I may be

3     rambling, but I need to just get it out.

4               I never thought Mr. Zwartz had anything to

5     do with what went on there.  He came in much later

6     in the game.  He inherited the culture, and knowing

7     Mr. Zwartz, I don't think that was his thought

8     process.

9               However, we started to send -- anything

10    over the core group, we infused African-Americans.

11    So anything like over 50, 55 people -- when we

12    jumped to 80, we wound up with 25, 30 additional

13    new people, and that went on for a while.  And then

14    it met with resistance again in 2015.

15              There was an individual by the name of

16    Ryan -- I don't know his last name, Connell or

17    something to that effect -- he sent Kyle -- he sent

18    Tom Zwartz an e-mail stating that ASI was sending,

19    quote/unquote, "new people" instead of experienced

20    people, which was creating havoc on his end because

21    he had to train new people.

22              And we didn't care.  We just sent them.

23         Q.    Sent who?

24         A.    African-Americans.

```
                                              Page 125
 1              Continued to send them.
 2         MR. ROTHSCHILD:  Can you hold on one second
 3    before your next question?
 4         MR. SELLERS:  Sure.
 5         MR. ROTHSCHILD:  I'm out of paper.
 6         MR. SELLERS:  Sure.
 7                        (Whereupon, a discussion was had
 8                         off the written record but on
 9                         the video record.)
10         MR. SELLERS:  Can you read back the last
11    question and answer?
12                        (Whereupon, the record was
13                         read.)
14    BY MR. SELLERS:
15         Q.   So, Mr. Swerdloff, as I understand it,
16    I asked you in this situation where they were
17    telling you that -- complaining that new workers
18    were being sent rather than experienced workers,
19    and I asked you what did you do about that.
20              And I think your answer was you continued
21    to send African-Americans?
22         A.   Yes.
23         Q.   Okay.  Did you understand -- what was your
24    understanding about the distinction between what
```

Page 126

1  new and experienced workers were in that context?

2     A.   Hispanic versus African-American.

3     Q.   The experienced were Hispanics?

4     A.   The experienced people would have been

5  people that would have been there forever or who

6  would have been there prior, but as their orders

7  went up, we did not have any more experienced

8  workers.  And rather than just send Hispanic

9  workers, we sent the -- on the flex part of it, we

10  sent a mixture of African-Americans and Hispanics.

11     Q.   And at whose direction did you understand

12  this to be -- this request for experienced workers

13  to be?  Who at Vee Pak?

14     A.   It was an e-mail that was sent from Ryan

15  to Tom Zwartz in September, I think.

16                    (Whereupon, SWERDLOFF Exhibit 17

17                    was marked for identification.)

18  BY MR. SELLERS:

19     Q.   Okay.  You have Exhibit 17 in front of

20  you?

21     A.   Correct.

22     Q.   Do you recognize this?

23     A.   Yes, I do.

24     Q.   What do you understand it to be?

Page 127

1     A.   I recognize it to be an e-mail sent from

2  Ryan to Tom, with a copy to our on-site manager and

3  various other personnel within Vee Pak.

4     Q.   And your on-site manager is Ms. Hernandez?

5     A.   Yes.

6     Q.   And then this is an e-mail from

7  Ms. Hernandez to some people, I assume, at ASI?

8     A.   I'm sorry?

9     Q.   At the very top, it's an e-mail from her,

10  from Ms. Hernandez, to -- is it Ms. Guerra?

11  Francis Guerra?

12     A.   This is a response that was sent from

13  Carmen to this e-mail sent by Ryan.  Carmen sent

14  the e-mail to her boss, which is Francis, as well

15  as Julie and Kyle.

16     Q.   And what position does Francis have or had

17  at the time?

18     A.   She's the -- she heads up all of the

19  on-site managers as well.  They all report to her.

20     Q.   I see.  Okay.

21          But she's an ASI employee?

22     A.   Yes, she is.

23     Q.   Is this the communication you were

24  referring to between Mr. Connell and Mr. Zwartz?

Page 128

1    A.    It is.

2    Q.    Was there any change in the nature of the

3    jobs that you were filling at Vee Pak from the

4    point at which this e-mail was sent to the prior

5    period that might require more experienced workers?

6    A.    No.

7    Q.    What response, if any, did you get when

8    you continued to refer African-American workers

9    after this e-mail?

10   A.    None.

11   Q.    Were they -- were they allowed to work at

12   Vee Pak?

13   A.    Yes.

14   Q.    Did there come a point when you -- when

15   ASI or you concluded that there was no longer a

16   preference for Hispanics at Vee Pak?

17   A.    Yes.

18   Q.    When do you think that occurred?

19   A.    I think the preference by Vee Pak

20   management started to sway in '13 and '14, my

21   opinion.  I believe the culture at the production

22   level took until about '15.  That is my opinion.

23   I think it was extremely difficult to change it,

24   but I believe it was changed as a result of the

Page 129

1   lawsuit.

2        Q.   Are you aware of whether Vee Pak has new

3   owners?

4        A.   Never met them.

5        Q.   Are you aware whether there are new

6   owners?

7        A.   Yes, I'm aware that Vee Pak was sold.

8        Q.   And do you know roughly when that

9   occurred?

10       A.   No, I don't know.

11       Q.   Okay.  Going back to the workers, the

12  African-American workers who were turned away by

13  somebody named Joe several years earlier, do you

14  know whether ASI paid them four hours of work that

15  day?

16       A.   I sure as hell hope we did.

17       Q.   That would have been your expectation?

18       A.   Yes.

19       Q.   Okay.  Did you just -- I think you've been

20  clear about this, but did you understand that

21  Mr. Montoya and Mario and Mr. Connell were speaking

22  for the company when it came to their expectations

23  about the type of laborers who were to be referred

24  over to the company in terms of whether they were

Page 130

1    African-American or Hispanic?

2        MR. RICHARDSON:  Object to the form.

3        THE WITNESS:  I don't know.

4    BY MR. SELLERS:

5        Q.    You don't know whether they were speaking

6    for the company?

7        A.    No, I don't.  My early-on meetings were

8    with Mike and Ralph Vennetti, who I thought were

9    both perfect gentlemen, especially Ralph.  They

10   never indicated to me any type of preference

11   whatsoever.  That reference or discrimination was

12   all at the floor level.

13       Q.    And, as I think you said before,

14   Mr. Montoya and Mario were in charge of the floor?

15       A.    Yes.

16       Q.    They were in charge of the operation?

17       A.    Absolutely.

18       Q.    And so they could dictate who could come

19   to work there on the floor and who could not, or

20   could somebody else?

21       MR. ROTHSCHILD:  Objection to form.

22       MR. RICHARDSON:  I'll join.

23       THE WITNESS:  They emphatically did.

24

Page 131

1    BY MR. SELLERS:

2        Q.   Let me ask the question differently.

3             Who did you understand at Vee Pak had

4    operational authority to determine who could work

5    at Vee Pak?

6        A.   Mario and Juan.

7        Q.   Are there any other occasions that you

8    have not discussed that you became aware of in

9    which people who worked at Vee Pak expressed a

10   demand or a preference or made some kind of comment

11   that indicated to you they did not want

12   African-Americans working at the company?

13       A.   I don't recall.

14       MR. SELLERS:  Okay.  All right.  Why don't we

15   take a break?  We may be close to being done.

16       THE VIDEOGRAPHER:  We are going off the video

17   record at 12:30 p.m., and this is the end of

18   Video Media 3.

19                      (A short break was taken.)

20       THE VIDEOGRAPHER:  We are back on video record

21   at 12:46 p.m.

22   BY MR. SELLERS:

23       Q.   Okay.  Thanks.

24            Just a few questions and I'll be done.

```
                                        Page 200
 1       MR. PAUL:  You can answer a fourth time, if you
 2   would like.
 3       THE WITNESS:  Do you want to repeat the
 4   question again?
 5                    (Whereupon, the record was
 6                     read.)
 7       THE WITNESS:  No, I didn't.
 8   BY MR. ROTHSCHILD:
 9       Q.   As a result of the discriminatory
10   statements made in '08, '09 by Juan, did you send a
11   greater number of Hispanic workers to Vee Pak than
12   you otherwise would have sent?
13       A.   In '09 to '11 --
14       Q.   I asked you about '98'-99.
15       MR. PAUL:  No, you didn't.
16       MR. ROTHSCHILD:  I'd like to strike that and
17   rephrase the question because that was my
18   intention.
19   BY MR. PAUL:
20       Q.   In '98-'99 when Juan made the statements
21   to you, did you send more Hispanic workers to
22   Vee Pak as a result of the statements he made to
23   you?
24       A.   At that time we only sent Hispanic
```

Page 201

1   workers, and we did not send anymore.

2       Q.   And why did you send Hispanic workers in

3   '98-'99?

4       A.   Because of the reasons I testified

5   earlier, that that was the type of individuals that

6   Vee Pak wanted.

7       Q.   According to what Juan had said?

8       A.   Correct.

9       Q.   Any other reason?

10      MR. PAUL:   Other than he testified this

11  morning?

12  BY MR. ROTHSCHILD:

13      Q.   Other than what you stated this morning,

14  any other reason?

15      A.   No.

16      Q.   Did you have workers available to send to

17  Vee Pak in '98-'99 of a different national origin?

18      A.   Some.

19      Q.   Are the workers that were sent to your

20  other customers in '98-'99 racially different than

21  the workers sent to Vee Pak?

22      A.   Back in '98 and '99, the far-reaching

23  majority of all people that we sent out were

24  Hispanic.